**UNITED STATES of America ex rel. Harry L. SANNEY, Petitioner-Appellant,**

**v.**

**Hon. Ernest L. MONTANYE, Superintendent Attica Correctional Facility, Attica, New York, Respondent-Appellee.**

.**No. 709, Docket 73-2534.**

United States Court of Appeals, Second Circuit.

Argued May 6, 1974.

Decided June 20, 1974.
Certiorari Denied Nov. 18, 1974.
See 95 S.Ct. 506.

Herman Schwartz, Amherst, N. Y.
(Edward I. Koren, New York Civil Liberties Union, Amherst, N.Y., of counsel), for petitioner-appellant.

Margery Evans Reifler, Asst. Atty.
Gen. (Louis J. Lefkowitz, Atty. Gen., of
N. Y., Samuel A. Hirshowitz, First Asst.
Atty. Gen., New York City, of counsel),
for respondent-appellee.

Before ANDERSON, FEINBERG and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge.

Petitioner Harry L. Sanney is presently serving a five to ten year sentence in the Attica Correctional Facility based on his plea of guilty in the Niagara County Court on May 25, 1970, to a charge of assault in the first degree. He challenges that conviction and the underlying indictment on the ground that they were the product of incriminating statements which he was compelled to make on the occasion of an interview for private employment. The district court denied a writ of habeas corpus, without evidentiary hearing.[1] We affirm.

The facts surrounding petitioner's conviction are undisputed. In December 1965 Sanney reported to the police that he had discovered the body of Charles Reynolds in a coal yard in Lockport, New York. Sanney admitted to the police that he and Reynolds had been together the night before; he naturally became a leading suspect in the murder case. The police questioned him at length, but did not arrest him.

In February 1966 Sanney applied for a position at the Reid Petroleum Corporation in Lockport and was hired. As part of the normal pre-employment testing, a company employee, John Bewick, on February 5, 1966, administered a polygraph examination. During this test Sanney stated that he had been a suspect in a murder case and moreover that he had not told the police the full story of his involvement, omitting the fact that he had hit or pushed the victim. According to the interrogator (Bewick) Sanney was nervous before this disclosure but appeared to experience a sense of relief at having made it, although he also seemed to be worried about losing his prospective job.

Bewick relayed this information to the police. At their request Bewick agreed to conduct a second polygraph session to explore further the role of Sanney in the murder. The district attorney and police also arranged with Bewick to carry a concealed transmitter so that they could in an adjoining room hear and record the conversation.

After Sanney had been on the job a day or two he was asked to submit to a second polygraph examination in connection with his qualifying for the position. On February 8, 1966, the second examination was conducted in Bewick's office, where Bewick pursued in depth the question of Sanney's involvement with Reynolds. Under Bewick's questioning Sanney admitted that he had dealt Reynolds a blow with a 2 x 4 piece of wood that lay about the coal yard. The police overheard the entire discussion and arrested Sanney shortly thereafter.

On the strength of his admissions to Bewick, Sanny was charged with manslaughter in the first degree. Sanney moved to dismiss the indictment on the grounds that his admissions to Bewick were the product of an interrogation that violated his Fourth and Fifth Amendment rights. The state court agreed and dismissed the indictment. On appeal the indictment was re-instated. The Appellate Division ruled that *Miranda* warnings were not required because Sanney was not in custody at the time of the polygraph test and that Sanney's Fourth Amendment rights had not been violated by the electronic transmission of his conversation with Bewick. People v. Sanney, 32 A.D.2d 737, 301 N. Y.S.2d 899 (4th Dept.1969).

Eventually Sanney pleaded guilty to a charge of assault in the first degree in satisfaction of the manslaughter indictment. He also pleaded guilty to a charge of assault in the second degree in satisfaction of a second set of charges lodged against him while he was free on bail. In June of 1970 Sanney was sentenced to a term ranging from a minimum of five to a maximum of ten years

1. No evidentiary hearing was required or requested because the essential facts are uncontested.

on the first charge and concurrently to a maximum of seven years on the second charge.

Sanney appealed from his conviction on the first charge, again raising the argument that his admissions were the product of illegal interrogation. The conviction was affirmed by the Appellate Division without opinion and leave to appeal to the Court of Appeals denied. Certiorari was denied by the Supreme Court. Sanney v. New York, 404 U.S. 978, 92 S.Ct. 344, 30 L.Ed.2d 294 (1971). Sanney then filed this petition for a writ of habeas corpus.

### Discussion

■ As a threshold matter the state maintains that Sanney waived any objection he might have to the admission of his confession by pleading guilty to the charge. See McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L. Ed.2d 763 (1970). However, under New York law an accused, despite his guilty plea, may challenge his conviction if he has sought to suppress the confession prior to his plea. N.Y.Crim.Proc.Law § 710.70(2) (McKinney 1971).[2] The district court reasoned that Sanney had in substance met the requirements of the New York law by his earlier motion directed against the indictment which "raised the claims upon which a motion to suppress would have been based," 352 F.Supp. 947, 948 (W.D.N.Y.1973), and concluded that the state courts had rejected Sanney's later appeal on the merits and not for the failure to meet a technical requirement under the criminal procedure code, 352 F.Supp. at 948–949. We agree and hold that Sanney did not waive the constitutional claims asserted here.

Turning to the merits, petitioner first urges, principally on the basis of Garri-

ty v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), that his incriminating admissions were the inadmissible product of economic coercion imposed by an agent of the state (Bewick), since Sanney's continued employment at Reid Petroleum Corporation was conditioned upon his submitting to the second polygraph test, during the course of which he furnished the damaging evidence. In *Garrity* the Court held that statements obtained by the State of New Jersey from police officers under the threat that, unless they waived their privilege against self-incrimination, they would be removed from office pursuant to a state statute, were involuntary and inadmissible in state criminal proceedings later instituted against them, since the statements had been obtained by unconstitutionally coercive means. *Spevack* extended the same principle to a state's threatened disbarment of a practicing attorney for refusal to furnish incriminating statements and documents. The district court held *Garrity* and *Spevack* inapplicable to the present case on the ground that they applied only to threatened "forfeiture of a governmental benefit, public employment" and not to the loss of private employment. Although we agree with the result reached by the court we cannot, in view of the Supreme Court's more recent decision in Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), share its reasoning, which restricts the principle of these cases too narrowly.

■ In *Lefkowitz* the Supreme Court held that a state could not compel incriminatory answers from independent contractors under the threat that unless they waived immunity they would be disqualified from contracting with state

---

2. The predecessor to § 710.70(2) in effect at the time of Sanney's plea and appeal was § 813–g of the Code of Criminal Procedure (McKinney Supp.1970). It read in pertinent part:

"If the motion [to suppress a confession or admission] is denied, the order denying such may be reviewed on appeal from a judgment of conviction notwithstanding the fact that such judgment of conviction is predicated upon a plea of guilty."

agencies for a period of five years. It found no constitutional significance in the fact that the statements were sought or obtained through coercion practiced upon members of the private, as distinguished from public, sector. The controlling factor is not the public or private status of the person from whom the information is sought but the fact that the state has involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement. Nor do we perceive any consequence flowing from the fact that the threat in the present case was conveyed through a private employer, admittedly acting as an agent for the police, rather than through a person on the public payroll. The state's involvement is no less real for having been indirect and no less impermissible for having been concealed. The state is prohibited in either event from compelling a statement through economically coercive means, whether they are direct or indirect.

■ Petitioner's reliance upon the *Garrity-Spevack* line of cases is misplaced, however, for a different reason. He erroneously assumes that the mere risk of any adverse economic consequence, however slight or insubstantial, that might result from failure to furnish a statement will automatically call for application of the principle. We disagree. A statement challenged on the ground that it was obtained as the result of economic sanctions must be rejected as involuntary only where the pressure reasonably appears to have been of sufficiently appreciable size and substance to deprive the accused of his "free choice to admit, to deny, or to refuse to answer." *Garrity, supra,* 385 U.S. at 496, 87 S.Ct. at 618, quoting from Lisenba v. California, 314 U.S. 219, 241, 62 S.Ct. 280, 86 L.Ed. 166. It must amount to a choice "between the rock and the whirlpool," 385 U.S. at 498, 87 S.Ct. at 619. As the Supreme Court recognized in *Lefkowitz, supra,* the economic sanctions

calling for application of the principle of *Garrity* must be "substantial," 414 U.S. at 82, 94 S.Ct. 316. For the policemen in *Garrity,* for instance, the loss of their positions could be objectively viewed as amounting to the end of their police careers. Similarly disbarment usually entails enormously adverse economic consequences for a practicing lawyer. As Justice Douglas pointed out in *Spevack* "[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawer relinquish the privilege." 385 U.S. at 516, 87 S.Ct. at 628. Likewise the loss of civil service jobs by public employees in Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation of the City of New York, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), could reasonably be viewed as threatening an economic catastrophe for those faced with the "choice" of waiving constitutional rights or losing status and benefits as public employees.

■ Turning to the present case, Bewick admittedly sought to use Sanney's prospective employment relationship as a means of obtaining incriminating information from him. But the threat of discharge from a job as a driver's assistant, which Sanney had held for one or two days, can hardly be labelled a "substantial economic sanction" rendering his statement involuntary. Sanney was not a policeman or public employee with many years of public service who faced the loss of pension rights, seniority status or other privileges if he refused to cooperate. See, e. g., *Garrity, supra,* and *Sanitation Men, supra.* Nor was he a professional who would lose his license, see, e. g., *Spevack, supra,* or be permanently foreclosed from an important segment of industry, see, e. g., *Lefkowitz, supra,* unless he confessed. Sanney was a transient manual laborer who had been on the job for at most a couple of days.[3] Moreover, the record

---

3. Our Brother Judge Feinberg in his dissent suggests that because of what he characterizes as the "secure niche in the professional world" of federal judges we overlook the significance of appellant's "menial" position and treat it as "beneath constitutional no-

supports the district court's finding that his statements, judged against the totality of the circumstances, were in fact voluntary. Although Bewick, at his initial interview of Sanney, thought that Sanney may have been worried about losing his prospective job (upon which he apparently had not started, it being a Saturday), Bewick also testified that Sanney "was actually getting a sense of relief or release from having told me this." Thus the interrogation was similar to the "situation where one who is anxious to make a clean breast of the whole affair volunteers the information," *Garrity, supra,* 385 U.S. at 499, 87 S.Ct. at 619. In short, his statement was not the product of a will overborne by threats or pressure.

■■ We likewise find no error in the district court's disposition of petitioner's other claims. Petitioner maintains that his statements are inadmissible against him because they were made without the benefit of warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The simple and complete answer is that he was not in custody when he was questioned by Bewick. United States v. Viviano, 437 F.2d 295 (2d Cir.), cert. denied, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971); United States v. Hall, 421 F.2d 540 (2d Cir. 1969), cert. denied, 397 U.S. 990, 90 S. Ct. 1123, 25 L.Ed.2d 398 (1970). Custody cannot be said to arise solely from the fact that a suspect is being questioned by a police agent, covert or otherwise. United States v. Viviano, *supra;* United States v. DiLorenzo, 429 F.2d 216, 219 (2d Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1609, 29 L.Ed.2d 120 (1971); United States v. Knohl, 379 F. 2d 427, 442 (2d Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465

(1967). The measure of custody for purposes of *Miranda* is whether the suspect was "deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. Here there was no restriction on Sanney's liberty. Had he declined to answer any questions or desired at any point to depart Bewick's office, Bewick would not have attempted to restrain him and, equally important, Sanney had no reason to believe that Bewick would do so. See United States v. Hall, *supra.* Sanney was thus not in custody.

■ Finally, there is petitioner's claim that the transmission of his conversation with Bewick to police in an adjoining room violated his Fourth Amendment rights. Under Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), we would be compelled to reject petitioner's claim if only because the electronic surveillance in question here, occurring prior to Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), was free from any hint of a trespass. Even if *Katz* governed, however, we would reject petitioner's claim for the reason that the statements were voluntarily made to Bewick without any "constitutional expectation of privacy." See United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); Hoffa v. United States, 385 U.S. 293, 87 S. Ct. 970, 17 L.Ed.2d 374 (1966); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

The judgment of the district court is affirmed.

FEINBERG, Circuit Judge (dissenting):

Since I agree with much of the majority's thinking, I dissent with regret. But I find it necessary to do so because

---

tice". This is plainly wrong. Our holding is not based on the meniality of appellant's position but upon the insubstantiality of the alleged economic sanction faced by him. Were he a pampered professional or high-paid businessman with a similar transient employment history and no assurance of tenure, the

result would be the same. The recent resignations of some federal judges because of inadequacy of their compensation should, if anything, suggest a community of interest, not a lack of appreciation, on the part of federal judges.

the majority's sound premises have unaccountably led to the wrong conclusion.

I turn first to those matters where happily we all agree. I concur in the finding that Sanney did not waive his constitutional claims. With respect to the merits, moreover, I have no quarrel with my brothers' holdings on the fourth amendment and *Miranda* contentions. Furthermore, I heartily adopt the majority's views on the existence of government action here. The "controlling factor" is not the state's role as employer (absent in the present case) but rather "the fact that the state has involved itself in the use of a substantial economic threat to coerce" incriminating disclosures. Equally correct is the conclusion that the Government may not compel "a statement through economically coercive means, whether   .   .   . direct or indirect," whether open or concealed.

We are all in accord that under the *Garrity* line of cases, the threatened economic sanctions must be "substantial," Lefkowitz v. Turley, 414 U.S. 70, 82, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), but I part company with my brothers on the question whether this test has here been met. Unlike them, I cannot say that the loss of a driver's assistant job is constitutionally insignificant. Our secure niche in the professional world should not cause us, as judges, to ignore what most people know: Even a menial position might be coveted by a man like Sanney—of marginal intelligence, and seemingly emotionally troubled as well. But we need not speculate on this point because Bewick testified that even at the initial interview, Sanney "was worried about losing his job" and "kind of completely crushed or emotional."

Moreover, the short term of employment should not make any difference. True, Sanney did not stand to lose pension rights or other benefits that sometimes accrue to senior workers; nor did he face deprivation of profitable government contracts or of a license to practice

his chosen profession. See Lefkowitz v. Turley, *supra*; Spevack v. Klein, 385 U. S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). But many a man works the whole of his life without material advancement in status and with no "vested" rights except to his wages earned that week. Such positions are often "transient" or seasonal in nature, yet they are nonetheless crucial to those whose livelihood depends upon them. I reject both the notion that a menial job is somehow beneath constitutional notice and the not unrelated idea that discharge from recently begun employment *must* be an insubstantial loss. I also note that differentiation of jobs, and hence of economically coercive effects, on the basis of length of time at work would force the courts to make ad hoc decisions in every case—in the absence of any clear criteria—as to how long a tenure is "long enough" to invoke the protective rule of *Garrity*. Such expenditure of effort is not, to my mind, justified by any compensating benefit.

Finally, I do not understand the majority's view that the "sense of relief," which Sanney may have experiencd as a result of his admissions, weakens a finding of coercion. A man with a guilty conscience may feel even greater release upon yielding to coercive interrogation than upon spontaneously admitting the facts since, at the end, he will have freed himself not only from the buried secret but also from the relentless prober. The issue is not how a suspect feels after he "reveals" his guilt, but how he was made to do so. The Constitution prohibits certain means of obtaining information even from those apparently. guilty, because we do not believe that the end justifies any means. That noble idea has not been followed here.

For these reasons, I would hold that Sanney was unconstitutionally coerced into incriminating himself and that his confession was improperly received in evidence. Accordingly, I would reverse.