Patrick J. CUNNINGHAM, Plaintiff,

v.

BRONX COUNTY DEMOCRATIC
EXECUTIVE COMMITTEE et al.,
Defendants.

No. 76 Civ. 1699 (CHT).

United States District Court,
S. D. New York.

April 22, 1976.
Probable Jurisdiction Noted Oct. 18, 1976.
See 97 S.Ct. 252.

Williams, Connolly & Califano by Edward Bennett Williams, Harold Ungar, Washington, D. C., Gregory J. Perrin, New York City, for plaintiff.

Farber, Raucher & Goldberg by David N. Raucher, New York City, for defendant Bronx County Democratic Executive Committee.

Melvin L. Schweitzer, New York City, for defendant New York State Democratic Committee.

Louis J. Lefkowitz, Atty. Gen. of State of New York, by Irving Galt, Lee Miller, Mark C. Rutzick, Asst. Attys. Gen., New York City, for defendant Louis J. Lefkowitz, Atty. Gen.

Burt Neuborne, Arthur Eisenberg, New York Civil Liberties Union, New York City, for amicus curiae.

Before KAUFMAN, Chief Judge, MANSFIELD, Circuit Judge, and TENNEY, District Judge.

## OPINION

TENNEY, District Judge.

Plaintiff Cunningham, a member and the duly elected chairman of the Bronx County Democratic Executive Committee ("the County Committee"), and a member of the Executive Committee and chairman of the New York State Democratic Committee ("the State Committee"), has instituted this action for a preliminary and permanent injunction and declaratory judgment,[1] restraining the enforcement, operation and execution of § 22 of the Election Law of the State of New York and declaring the unconstitutionality of the said statute as violative of the First, Fifth and Fourteenth Amendments to the Constitution of the United States and the invalidity of any action taken under the said statute with respect to plaintiff.

On April 13, 1976, by order to show cause alleging such unconstitutionality, Cunningham moved for the convening of a three-judge court and a temporary restraining order against defendants. After hearing the parties on that date, the single district judge found that plaintiff had raised issues that were neither insubstantial nor obviously without merit and accordingly issued a temporary restraining order and requested the convening of a three-judge court.[2] Pursuant to the April 14, 1976 order of Chief Judge Irving R. Kaufman the motion for injunctive relief was submitted to this statutory three-judge court which heard argument on April 19, 1976. At that time, the Court ordered the trial of the action on the merits advanced and consolidated with the application for injunctive relief pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure.

It appears that on December 29, 1975 Cunningham was subpoenaed to appear and testify before the Extraordinary Special Grand Jury for Bronx County. Thereafter, he unsuccessfully moved in the state court to quash the subpoena upon the ground, among others, upon which relief is sought in the instant action. Such motion was denied by the Supreme Court on February 23, 1976 and such order of denial was affirmed by the state appellate courts.

Following such affirmance and on April 12, 1976 Cunningham appeared before the said grand jury pursuant to the subpoena. On that date he was asked to execute a waiver of immunity from prosecution in accordance with Section 22 which he declined to do. Section 22 reads as follows:

"If any party officer shall, after lawful notice or process, wilfully refuse or fail to appear before any court or judge, grand jury, legislative committee, officer, board or body authorized to conduct any hearing or inquiry concerning the conduct of his party office or the performance of his duties, or having appeared, shall refuse to testify or answer any relevant question, or shall refuse to sign a waiver of immunity against subsequent criminal prosecution, his term or tenure of office shall terminate, such office shall be vacant and he shall be disqualified from holding any party or public office for a period of five years."

There is no dispute that the grand jury was empowered to inquire concerning Cunningham's conduct of his party offices or

1. Jurisdiction is invoked under 28 U.S.C. § 1343, this being a suit in equity under 42 U.S.C. § 1983; it is further invoked under 28 U.S.C. § 2281 and § 2201.

2. Title 28 U.S.C. §§ 2281 and 2284.

the performance of his duties as a party officer.[3]

Cunningham, supported by the New York Civil Liberties Union, as amicus curiae, claims that the statute, insofar as it would remove him from his various party offices, impinges upon the First Amendment rights of political association of the Democratic Party and its members, which Cunningham has vicarious standing to assert. He further contends that his refusal to execute a waiver of immunity from prosecution is a valid exercise of his rights under the Fifth and Fourteenth Amendments. In sum, plaintiff contends that, since Section 22 would operate to remove him from his present party offices and to bar him from holding party or public office for a period of five years as a sanction for a valid exercise of his constitutionally guaranteed rights, the provision is invalid as to him as violative of the First, Fifth, and Fourteenth Amendments to the Constitution. In addition, plaintiff contends that since the Section is self-executing, it causes him immediate and irreparable harm for which no adequate remedy at law exists.

Since we find Section 22 violative of Cunningham's rights under the Fifth and Fourteenth Amendments,[4] we do not pass upon the First Amendment claim. Nor have we considered the due process implications of *Slochower v. Board of Higher Education of New York City*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

Plaintiff relies on a line of cases emanating from the United States Supreme Court beginning with *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and including *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Uniformed Sanitation Men v. Sanitation Commissioner*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); and *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). Plaintiff claims that the statutes at issue in each of these cases, all of which were struck down, are analogous to the statute in the instant case in that each conditioned an individual's continuation as a public employee or a public contractor upon the individual's waiver of his privilege against self-incrimination.[5]

Defendant, Louis J. Lefkowitz, the Attorney General of the State of New York, contends that the interest of the State in preserving the integrity of its political system outweighs plaintiff's interest in his offices and his assertion of his constitutional rights. Defendant's argument begins with the proposition that each of the several states retains power to "establish and maintain" its own political system in accordance with the Tenth Amendment. Essential to the exercise of this power is the need for the State to demand from party officers both integrity and the appearance thereof. Defendant claims that since the offices held by Cunningham are creations of State law,

---

**3.** It should be noted that Cunningham is a party officer, and not a federal, state or local officer. He is not a public officer, *Doherty v. Meisser*, 66 Misc.2d 550, 551, 321 N.Y.S.2d 32, 35 (Sup.Ct.Nassau Cty.1971); *People v. Clampitt*, 34 Misc.2d 766, 767, 222 N.Y.S.2d 23, 25 (Ct. of Spec.Sess.N.Y.C.1961); *Sulli v. Board of Supervisors of Monroe County*, 24 Misc.2d 310, 313, 200 N.Y.S.2d 218, 223 (Sup.Ct.Monroe Cty.1960), although at times he may become involved in the nomination process or help to fill vacancies in elective positions. See *Seergy v. Kings County Republican Committee*, 459 F.2d 308, 310 (2d Cir. 1972).

**4.** The Fifth Amendment reads in pertinent part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

The Fourteenth Amendment reads in pertinent part:
". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

**5.** We do not reproduce the offending statutes, but merely note that while the language may not be identical to Section 22, their substance is the same in that each statute would seek to compel testimony by the exaction of a price for a waiver of the constitutional right not to incriminate oneself. We note that there was no statute at issue in *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

and since the offices carry with them tremendous responsibility for the selection of candidates for political office, they constitute an important part of the overall political system of the State. Thus, defendant would have this Court hold that the interest of the State in maintaining the integrity of party office and, in fact, the political system of the State, predominates over the constitutional rights of the individual.

Defendant would distinguish the instant situation from that existing in the many cases cited by plaintiff on several grounds.

The initial ground upon which the State seeks to distinguish the instant case is the applicability of the statute. Defendant contends that in each of the cases cited by plaintiff the statute was uniformly applicable to all citizens while the statute in the instant case applies to a relatively limited and select number of persons.

Secondly, the State would distinguish the instant situation based upon the sensitivity of the positions held by persons affected by the statute. While the cases cited by plaintiff dealt with public employees and public contractors, the sensitivity and 'importance of the positions held by party officers must lead, defendant contends, to the conclusion that the public interest rises above the interest sought to be asserted by the individual.

Finally, defendant contends that the element of economic coercion, and its onerous impact on a person's decision to waive a constitutionally guaranteed right, was critical to the decision reached by the Supreme Court in each of the cases cited by plaintiff. Here, however, defendant points to the alleged absence of any element of economic coercion since Cunningham allegedly derives no monetary compensation from the various positions which he holds.

Before discussing the cases already cited which, we believe, compel the decision we reach herein, some historical comment in this bicentennial year of this nation may not be inappropriate—in particular with reference to the Fifth Amendment which provides in pertinent part that "[n]o person . . . . shall be compelled in any criminal case to be a witness against himself . . .." As Mr. Chief Justice Warren wrote in *Quinn v. United States*, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955):

"The privilege against self-incrimination is a right that was hard-earned by our forefathers. The reasons for its inclusion in the Constitution—and the necessities for its preservation—are to be found in the lessons of history. As early as 1650, remembrance of the horror of Star Chamber proceedings a decade before had firmly established the privilege in the common law of England. Transplanted to this country as part of our legal heritage, it soon made its way into various state constitutions and ultimately in 1791 into the federal Bill of Rights. The privilege, this Court has stated, 'was generally regarded then, as now, as a privilege of great value, a protection to the innocent through a shelter to the guilty, and a safeguard against heedless, unfounded, or tyrannical prosecutions.' Coequally with our other constitutional guarantees, the Self-Incrimination Clause 'must be accorded liberal construction in favor of the right it was intended to secure.' Such liberal construction is particularly warranted in a prosecution of a witness for a refusal to answer, since the respect normally accorded the privilege is then buttressed by the presumption of innocence accorded a defendant in a criminal trial. To apply the privilege narrowly or begrudgingly—to treat it as an historical relic, at most merely to be tolerated—is to ignore its development and purpose." *Id.* at 161–62, 75 S.Ct. at 673, 99 L.Ed. at 971–972. (footnotes omitted).

Thus, though we may be dealing with the interest of a State in preserving the integrity of its political system, we are also dealing with the fabric of our individual liberties.

Passing then to the cases which we believe control, in *Garrity v. New Jersey, supra*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562, several police officers were questioned in connection with an investigation by the Attorney General of New Jersey into al-

leged ticket fixing. Each officer was warned that anything he said could be used against him in any criminal proceeding and that his Fifth Amendment privilege applied, but that his refusal to answer any questions would subject him to removal from office under N.J.Rev.Stat. § 2A:81–17.1 (Supp.1965). Under the circumstances, the officers answered the questions and some of their answers were then used in criminal prosecutions of them. The officers were convicted and the convictions sustained in the state courts despite the officers' objection that the convictions had been obtained in large part based upon statements which were coerced. In reversing the convictions, the Supreme Court noted:

> "The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Id.* at 497, 87 S.Ct. at 618, 17 L.Ed.2d at 565.

The Court further noted that "[w]here the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other," *id.* at 498, 87 S.Ct. at 619, 17 L.Ed.2d at 566, and concluded that there was no voluntary waiver of the privilege.

In *Spevack v. Klein, supra,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574, appellant, a lawyer, was called upon to produce records and to testify in a disciplinary proceeding then pending against him, but refused to do so on the basis that the production of the records and his testimony might tend to incriminate him. He was subsequently disbarred. The Court found that the threat of disbarment with the concomitant loss of professional standing and livelihood was coercive, and held that the lawyer, like the policemen in *Garrity,* could not be forced to choose between self-incrimination and loss of employment or professional standing. *Id.* at 516, 87 S.Ct. at 628, 17 L.Ed.2d at 578. In a concurring opinion, Mr. Justice Fortas distinguished between the lawyer, a mere license holder, and a public employee. He carefully noted:

> ". . . I would distinguish between a lawyer's right to remain silent and that of a public employee who is asked questions specifically, directly, and narrowly relating to the performance of his official duties as distinguished from his beliefs or other matters that are not within the scope of the specific duties which he undertook faithfully to perform as part of his employment by the State. This Court has never held, for example, that a policeman may not be discharged for refusal in disciplinary proceedings to testify as to his conduct as a police officer. It is quite a different matter if the State seeks to use the testimony given under this lash in a subsequent criminal proceeding." *Id.* at 519–20, 87 S.Ct. at 630, 17 L.Ed.2d at 580.

The next case to be decided in this line was *Gardner v. Broderick, supra,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082. In *Gardner,* a police officer was subpoenaed to appear before a grand jury investigating official corruption. The officer appeared and was advised that the grand jury intended to examine him with regard to the performance of his official duties. He was also advised of his privilege against self-incrimination and was asked to execute a waiver of immunity. He was told that he would be subject to termination under Section 1123 of the New York City Charter if he refused to execute the waiver, but he nevertheless refused to do so. After an administrative hearing he was discharged from his employment solely for his refusal to sign the waiver. The discharge was upheld on appeal in the courts of the state. The Supreme Court reversed, however, holding that "the mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment." *Id.* at 279, 88 S.Ct. at 1916, 20 L.Ed.2d at 1087.

In *Uniformed Sanitation Men v. Sanitation Commissioner, supra,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089, several New York City sanitation men were called before the Commissioner of Investigation of

the City who was then investigating alleged corruption in the Sanitation Department. All of the men were made aware of the provisions of Section 1123 of the New York City Charter, namely, that their refusal to testify based on their privilege against self-incrimination would be grounds for termination. As in the other cases discussed herein, the exercise of the privilege was followed by a termination of employment which was upheld on appeal. Once again the Supreme Court reversed, noting that the sanitation men had not been fired for refusing to account for their conduct while employees of the City, but rather for their insistence on asserting their privilege against self-incrimination. *Id.* at 283, 88 S.Ct. at 1919, 20 L.Ed.2d at 1092. The holding of the Court made it clear that continuance in public employment could not be conditioned on the forfeiture of an important constitutional right. *Id.* at 284–85, 88 S.Ct. at 1919–20, 20 L.Ed.2d at 1093. The Court noted that public employees must account for the performance of their public trust or suffer dismissal for their failure to do so, but only after their privilege against self-incrimination had been preserved. *Id.*

*Lefkowitz v. Turley, supra,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274, presented the same basic question in a different factual setting. Both the New York General Municipal Law and the New York Public Authorities Law required public contracts to contain a clause which provides that a contractor must answer all inquiries concerning the conduct of the contract without regard to the privilege against self-incrimination or risk cancellation of all existing contracts and a five-year disqualification from future contracts. Appellees were two architects who were called to testify before a grand jury concerning charges of conspiracy, bribery, and larceny in connection with public contracts. They were asked to execute waivers of immunity, but refused, and the various public contracting authorities were duly notified. Appellees thereupon sought judicial intervention and a three-judge district court declared the statutory provisions to be unconstitutional as viola-

tive of the Fifth and Fourteenth Amendments. The Supreme Court affirmed. *Id.* at 76, 94 S.Ct. at 321, 38 L.Ed.2d at 281. The Court was keenly aware of the powerful interest of the State in maintaining the integrity of both civil service and public contracts, but concluded that the privilege could not yield to such considerations. *Id.* at 78–79, 94 S.Ct. at 322–23, 38 L.Ed.2d at 282. The State attempted to distinguish private citizens doing public contracting from public employees. The rationale underlying the claimed distinction was that these contractors did not wholly depend on the State for their livelihood, thus removing the element of economic coercion which would invalidate any waiver of the privilege. In response to this argument, the Court stated:

> "We fail to see a difference of constitutional magnitude between the threat of job loss to an employee of the State, and a threat of loss of contracts to a contractor." *Id.* at 83, 94 S.Ct. at 325, 38 L.Ed.2d at 285.

Section 22 of the New York Election Law is similar in operation to the statutes truck down in the aforementioned cases in that it conditions tenure in office upon the forfeiture of the privilege against self-incrimination. As such, it would appear to fail to measure up to constitutionally established standards.

We turn, however, to the arguments raised by defendant, the State, in favor of constitutionality.

Defendant initially contends that Section 22 is not a statute of uniform applicability to all citizens, but is limited in its application to a relatively small number of persons in particularly sensitive positions. No cases have been cited by defendant to support this position. No sound reasoning would limit the operation of so fundamental a constitutional right as the privilege against self-incrimination based upon the number of persons within a statutory grouping.

Defendant next seeks to distinguish the instant case based on the sensitivity and importance of party officers to the overall

**1010**

operation of the political system of the State and the maintenance of the integrity of that system. This, of course, is a claim of overriding interest, i. e., that the interest of the state in the operation and integrity of its political system is sufficiently strong to override the privilege. However, as Mr. Justice White observed in *Lefkowitz v. Turley, supra*, 414 U.S. at 78, 94 S.Ct. at 323, 38 L.Ed.2d at 282, "claims of overriding interests are not unusual in Fifth Amendment litigation and *they have not fared well.*" (Emphasis added).

In support of this argument, defendant cites to the concurring opinion in *People v. Avant*, 33 N.Y.2d 265, 352 N.Y.S.2d 161, 307 N.E.2d 230 (1973), wherein it is stated parenthetically:

"(The lowness in rank of the officer involved is not unimportant. One is entitled to doubt that the Supreme Court would find it coercive to require a Judge, a ranking executive officer, or a member of the Legislature to surrender his privilege against self incrimination in order to qualify for or retain his office.)" *Id.* at 274, 352 N.Y.S.2d at 168, 307 N.E.2d at 235.

We find no merit in the suggestion that advancement in office diminishes one's constitutional rights. We further note that the concurrence in *Avant* conceded that "it is now equally undisputed that one may not be 'coerced' into waiving his constitutional privilege by the withholding of a substantial right to engage in one's occupation or of any other substantial or fundamental exercise of life, liberty, and the pursuit of happiness." *People v. Avant, supra*, 33 N.Y.2d at 273, 352 N.Y.S.2d at 167, 307 N.E.2d at 234.

As Mr. Justice Douglas stated in *Spevack v. Klein, supra*, 385 U.S. at 516, 87 S.Ct. at 628, 17 L.Ed.2d at 578:

"We find no room in the privilege against self-incrimination for classifications of people so as to deny it to some and extend it to others."

■ Lastly, defendant contends that since Cunningham derives no monetary compensation from his various offices he can claim no "substantial economic sanction," *Lefkowitz v. Turley, supra*, 414 U.S. at 82, 94 S.Ct. at 324, 38 L.Ed.2d at 284, such as to invalidate a waiver of rights as coercive. Each of the cases decided by the Supreme Court and discussed above have spoken in terms of economic loss. Yet in each case economic loss was clearly present and in no case did the Supreme Court have to reach the larger question, i. e., whether the substantial loss must be purely economic. It could be argued that the instant case begs the question.

The loss to the individual as a result of the claim of privilege is important only insofar as it indicates the duress one feels when faced with the choice "between the rock and the whirlpool." The element of duress would operate to invalidate any waiver of the privilege as inherently involuntary. Since the focus is on the coercive element and its impact on freedom of choice, there would appear to be no strong policy reason for limiting the loss exacted to the purely pecuniary.[6]

Indeed, it is logical to assume that in a statute designed to elicit testimony, the alternative to a waiver of the constitutional right, in whatever form, must be coercive or punitive for the statute to be effective.

**6.** We do not consider *United States ex rel. Sanney v. Montayne*, 500 F.2d 411 (2d Cir.), cert. denied, 419 U.S. 1027, 95 S.Ct. 506, 42 L.Ed.2d 302 (1974) inconsistent with the result we reach herein. In that case the threatened damage to professional or personal reputation was not a compelling factor. The Court, however, (500 F.2d at 415) quoted with approval the language of *Spevack v. Klein, supra*, 385 U.S. at 516, 87 S.Ct. at 628, 17 L.Ed.2d at 578 equating such non-economic damage with unconstitutional compulsion.

We are also aware of the decision of the United States Supreme Court on April 20, 1976 in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810, 44 U.S.L.W. 4487, 4490 (U.S., April 20, 1976) relating to a prisoner's right to remain silent in a prison disciplinary hearing. Such cases are clearly inapposite. Cunningham is neither a prisoner nor, indeed, an accused.

Cunningham, although not a public officer, is "the top leader of the Democratic Party in New York State." *New York Democratic Party Rules* Art. IV § 1(b)(ii). It is the responsibility of party officers to select or recommend those candidates whom they judge to be best qualified to discharge the judicial, legislative and executive responsibilities of government and to then present them to the electorate as the choice of the political party. In many counties such nomination is tantamount to election. The threat of loss of professional standing and of reputation are powerful forms of compulsion. *Spevack v. Klein, supra,* 385 U.S. at 516, 87 S.Ct. at 628, 17 L.Ed.2d at 578. To threaten to strip Cunningham of his party position is, given these powers and perquisites, clearly coercive. Indeed the finding of coercion in *Spevack* rested at least as much upon the non-economic aspects of disbarment as the economic, "for the dishonor of disbarment" is mentioned in that opinion before "the deprivation of a livelihood," *id.* at 514, 87 S.Ct. at 627, 17 L.Ed.2d at 577, and reference is made to the loss of one's "standing" and "reputation" as a "professional" before it is noted that the loss of "livelihood" is also a consequence of disbarment. *Id.* at 516, 87 S.Ct. at 628, 17 L.Ed.2d at 578.

However, there is economic coercion as well present in the instant case. Under Section 22 the party officer is barred for five years from serving as a party or public officer, and the latter position is normally remunerative. Although Cunningham does not presently receive a salary, Article VI § 4 of the *New York Democratic Party Rules* permits the State Committee or the County Committee to fix a salary for the Chairman of the State Committee. We would, moreover, be naive if we did not recognize the inevitable economic impact upon Cunningham, a practicing attorney, concomitant with being forced out, under a cloud, of the state party chairmanship. When this potential economic sanction is viewed alongside the loss of political influence and the damage to reputation which Cunningham would suffer if removed from office through the operation of Section 22,

that level of loss deemed to be coercive would, in fact, be present.

■ Do we, as may be suggested, in holding for plaintiff foreclose the State in its discovery and prosecution of alleged or suspected political corruption? We think not. As stated by Mr. Justice White in *Lefkowitz v. Turley, supra,* 414 U.S. at 84, 94 S.Ct. at 325, 38 L.Ed.2d at 285:

> "Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use. *Kastigar v. United States* . . .. [406 U.S. 441, 92 S.Ct. 1655, 32 L.Ed.2d 212] Furthermore, the accommodation between the interest of the State and the Fifth Amendment requires that the State have means at its disposal to secure testimony if immunity is supplied and testimony is still refused. This is recognized by the power of the courts to compel testimony, after a grant of immunity, by use of civil contempt and coerced imprisonment. *Shillitani v. United States,* 384 U.S. 364 [86 S.Ct. 1531, 16 L.Ed.2d 622] (1966). Also, given adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment."

Thus, following the decision of the Supreme Court in *Uniformed Sanitation Men v. Sanitation Commissioner, supra,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089, the sanitation men were again questioned *after being granted immunity* and refused to answer on the ground, among others, that their privilege against self-incrimination would be violated. The Court of Appeals for this Circuit held that the grant of immunity effectively invalidated the claim of constitutional deprivation. *Uniformed Sanitation Men Association Inc. v. Commissioner of Sanitation of the City of New York,* 426 F.2d 619 (2d Cir. 1970), *cert. denied,* 406

U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349 (1972).

In striking down the statute that would penalize Cunningham for the exercise of his constitutional rights we do not condone corruption in public óffice if and when it is shown to exist, any more than we condone the traffic in drugs, crimes of violence, corruption in business or other crime when we grant the accused freedom from compulsion in the exercise of his constitutional right not to bear witness against himself. Nor are we convinced that a corrupt police force is less of a danger to the state than a corrupt politician.

We are reminded by the late Chief Justice Warren that the constitutional right, privilege or immunity with which we are concerned had its origins in the horror of Star Chamber proceedings in England more than a century before the birth of this nation and we are aware that the victims of the Star Chamber were not merely constables or tradespeople but also men of high office and estate. And when we are instructed that *no man* may be compelled, we are obliged to strike down the instrument that would compel.

Accordingly, plaintiff's claim for preliminary and permanent injunctive and declaratory relief is hereby granted.

So ordered.

IRVING R. KAUFMAN, Chief Judge (concurring):

I concur fully in Judge Tenney's thorough opinion. It is important, however, lest our action today be misunderstood, that we stress what this Court has *not* held.

Our decision does not in any way mandate that the plaintiff be permitted, by those he represents, to remain in office—or, indeed, that he should be reelected to his positions within the Democratic party. Nor have we ruled that Cunningham may continue to avoid testifying before the grand jury. To the contrary, Judge Tenney has taken pains to point out that the plaintiff may be compelled to testify and disclose the truth regarding matters under investigation—on pain of imprisonment or fine for refusal to testify or for perjury in any testimony given—so long, of course, as the immunity which the Constitution[1] requires be afforded to *all* witnesses is also extended to him.

Finally, our holding places no restraint whatsoever on the State's power to prosecute Patrick Cunningham on the basis of evidence that it may already have uncovered, or will discover in the future, through its official investigations. But, the State cannot coerce Cunningham to establish its charges out of his own mouth. As Mr. Justice Frankfurter so eloquently stated,

> Ours is the accusatorial as opposed to the inquisitorial system. . . . Under our system society carries the burden of proving its charge . . . .. It must establish its case, not by interrogation of the accused . . ., but by evidence independently secured through skillful investigation.

*Watts v. Indiana*, 338 U.S. 49, 54, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801, 1806 (1949).

Only at our peril and at the peril of our free governmental process can we ignore the immense dangers posed by corruption and by abuses of official position. But, when faced by a statute intended to uncover possible misconduct which inescapably runs afoul of the fundamental guarantees of the Fifth Amendment, our duty is clear beyond peradventure.

It must have been apparent to all who played a role in this constitutional drama, after even cursory research of the authorities, that the answer to the narrow constitutional question presented to us had been clearly foreordained by the United States Supreme Court in an unbroken series of decisions during the past decade. Judge Tenney's opinion describes with admirable clarity how the Supreme Court has consistently struck down as unconstitutional a

---

1. We are not faced with the question whether any additional immunity may be required under New York State statutes, although this is a question the Deputy Attorney General undoubtedly will wish to consider. *See, e. g.,* N.Y.Crim.Proc.Law §§ 50.10(1), 190.40(2).

number of statutes virtually identical in their wording and practical impact to the one before us today. We will not—and, indeed, we cannot—flout that unambiguous mandate. Judge Cardozo (then Judge on the New York Court of Appeals) reminded us a judge is

> not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. . . . He is not to yield to spasmodic sentiment . . ..

Cardozo, *The Nature of the Judicial Process* at 144 (1921).

Our task is narrowly circumscribed: we must view § 22 of the New York Election Law in light of the Fifth Amendment and its consistent application by the Supreme Court in similar circumstances. And we must remain ever mindful that the fundamental protections of the Constitution and its Bill of Rights extend to all citizens, whether popular and powerful, or weak and oppressed. It "covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120–21, 18 L.Ed. 281, 295 (1866).

By our decision today we do not condone the abuse by any individual—however exalted his position may be—of his power or the public trust. Some will undoubtedly dispute the wisdom or propriety of Cunningham's decision to exercise his rights not to testify before the grand jury, given the circumstances here present. Its political or ethical consequences, however, can only be determined in the public arena.

MANSFIELD, Circuit Judge (concurring):

Were this a case of first impression, the Attorney General's arguments might be persuasive. But in light of the firmly settled Supreme Court case law on the constitutional issue, I subscribe to Judge Tenney's clear-cut, carefully considered statement of what we hold and to Chief Judge Kaufman's further explication of what we do not hold.

Though the result may not yield to popular hue and cry, it adheres to the rule of law by which we are all bound. "If the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned." *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 483, 54 S.Ct. 231, 256, 78 L.Ed. 413, 452 (1934) (Sutherland, J., dissenting).