UNITED STATES of America, Plaintiff,

v.

Pablo CAMACHO, et al., Defendants.

No. 89–650–CR.

United States District Court,
S.D. Florida.

May 25, 1990.

Edward Nucci, Daniel Gelber, Asst. U.S. Attys., S.D. Fla., Miami, Fla., for plaintiff.

James R. Gailey, Miami, Fla., for defendant Pablo Camacho.

John Bergendahl, Asst. Federal Public Defender, Miami, Fla., for defendant Charlie Haynes.

David Goodhart, Miami, Fla., for defendant Ronald Sinclair.

Richard Sharpstein, Coconut Grove, Fla., for defendant Thomas Trujillo.

Roy Kahn, Miami, Fla., for Nathaniel Veal, Jr.

Leonard Baer, Coral Gables, Fla., for defendant Andy Watson.

## ORDER

MARCUS, District Judge.

This Cause has come before the Court upon Defendants' Motion to Suppress Statements filed on February 7, 1990. For the reasons set forth below, Defendants' Motion is GRANTED in part and DENIED in part.

### I.

The Defendants Pablo Camacho, Charlie Haynes, Ronald Sinclair, Thomas Trujillo, Nathaniel Veal, Jr. and Andy Watson, members of the Street Narcotics Unit of the Miami Police Department, have been charged under Title 18 U.S.C. §§ 241 and 242 with violating the civil rights of Leonardo Mercado. These charges arise out of an incident occurring on the evening of December 16, 1988 at which time the Defendants allegedly engaged in a struggle with Mercado which led to his death.

In their motion, Defendants now seek to suppress various statements concerning the events surrounding the death of Leonardo Mercado on December 16, 1988 [1]. The defendants maintain that the statements were coerced and made involuntarily because they were threatened with dismissal from their jobs as policemen if they refused to give statements.[2] Therefore, the Defendants contend, the statements must be suppressed under *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) and its progeny. Determination of the issues raised by the Defendants' Motion requires a careful review of the events occurring on the night of December 16 and into the following morning. We conducted a lengthy evidentiary hearing as to these matters and make the following findings of fact and conclusions of law.

## II.

The events at issue began at approximately 5:30 p.m. on the evening of December 16, 1988, when the Defendants, while on duty, arrived at the corner of North West 7th Avenue and Thirty–Second Street, the scene of an incident leading subsequently to the death of Leonardo Mercado. Shortly after radio notification by the Defendant officers that Mercado had been seriously injured while in the custody of the officers, Miami Police Department Sergeants Manuel Orosa and Anthony Rodriguez arrived at the scene. Shortly after his arrival, Sergeant Orosa briefly questioned Officers Camacho and Sinclair regarding the events which had transpired. In substance, Camacho and Sinclair informed Orosa that a struggle had ensued between Camacho and Trujillo and Mercado inside the house located on the property. Shortly thereafter, the other four Officers entered the house to render assistance. Additionally, Haynes, Sinclair, Veal and Watson informed Orosa that they had no "hands on" contact with Mercado. Pursuant to standard department procedure, Orosa ordered the six officers to return to the police station.

Upon arriving at the police station, the Defendants proceeded to the Street Narcotics Unit office on the second floor of the building. While the Defendants were in

---

1. The specific statements which the Defendants have moved to suppress consist of the following statements printed in Government's Exhibit 6:

   *Camacho*
   1) Statement made to Sergeant Orosa at scene of incident on December 16, 1988.
   2) Statement made to City of Miami Detective at 6:25 p.m. on December 16, 1988.

   *Haynes*
   1) Statement given to Sergeant Orosa at scene of incident on December 16, 1988.
   2) Preliminary statement given to Sergeant Green at police station on the night of December 16, 1988.
   3) Formal statement to Sergeant Green at police station on December 17, 1988.
   3) Statement given to Sergeant Green at Haynes' residence on December 17, 1988.

   *Sinclair*
   1) Statement given to Sergeant Orosa at scene of incident on December 16, 1988.
   2) Preliminary statement given to Sergeant Green at police station on the night of December 16, 1988.
   3) Formal statement given to Sergeant Green at police station on December 17, 1988.
   4) Statement made to Sergeant Green at Sinclair's residence on December 19, 1988.

   *Trujillo*
   1) Statements made to Sergeant Orosa at scene of incident on December 16, 1988.

   2) Statement made to City of Miami Detective at the police station at 6:25 p.m. on December 16, 1988.

   *Veal*
   1) Statement made to Sergeant Orosa at scene of incident on December 16, 1988.
   2) Preliminary statement given to Sergeant Green at the police station on the night of December 16, 1988.
   3) Formal statement given to Sergeant Green at the police station on December 17, 1988.

   *Watson*
   1) Statement made to Sergeant Orosa at scene of incident on December 16, 1988.
   2) Preliminary statement given to Sergeant Green at the police station on the night of December 16, 1988.
   3) Formal statement given to Sergeant Green at the police station on December 17, 1988.

2. The parties have made little effort to distinguish between the various statements which were made by the Defendants. The primary distinction which has been brought out, however, is between statements made at the scene of the incident on the one hand and statements made thereafter at Homicide headquarters and at Defendant Haynes and Sinclair's residences on the other hand.

the Street Narcotics Unit office, Lieutenant Mike Gonzalez, Commander of the Departments' Homicide Division, was informed that Mercado had died of injuries received during the incident involving the Defendants. Departmental policy requires that the Homicide Division conduct an investigation of all in-custody deaths. Accordingly, Gonzalez determined that a "shooting team"[3] should be assembled consisting of Homicide personnel, a representative from the State Attorneys Office and a representative from the Internal Security Division of the Police Department. In order to begin the investigation, Gonzalez directed Sergeant Rodriguez, a member of the Homicide Division, to go to the second floor and direct the Defendants to appear at the Homicide Division on the fifth floor of the building. In accordance with Gonzalez's order, Rodriguez informed the Defendants that Gonzalez had ordered them to appear at the Homicide Division. During this time, Rodriguez came upon Defendants Camacho and Trujillo who informed Rodriguez that they were involved in the incident.[4]

By about 7:00 p.m. all six Defendants had appeared at the offices of the Homicide Division. As part of the standard procedure, the Defendants were directed to sit in the Homicide office at separate desks and were further told not to talk among themselves. Several Homicide officers were assigned to watch the Defendants and escort them when they walked about the offices or went to the bathroom. With the exception of Officer Camacho, who made an escorted trip to the hospital to be treated for injuries suffered during the struggle with Mercado, the Defendants remained in the Homicide offices throughout the night and into the early morning hours of December 17, 1989.

At approximately the same time that the Defendants reached the Homicide offices, Assistant State Attorney Jay Novick arrived at Homicide. Novick reported to Homicide for the purpose of acting as legal advisor to the investigating Homicide Officers. Lieutenant Gonzalez consulted with Novick regarding procedures to be followed in taking statements from Officers Haynes, Sinclair, Veal and Watson. By this time Gonzalez had been informed by Rodriguez that Officers Camacho and Trujillo were "hands on" officers who had apparently been directly engaged in the struggle with Mercado. The details of what happened to Mercado remained unclear to Gonzalez at this time. Novick and Gonzalez agreed that Gonzalez would first individually call each officer into his office in order to ask who was involved in the struggle with Mercado and who was simply a witness to the incident. Shortly thereafter, Haynes, Sinclair, Veal and Watson were separately called into Gonzalez's office and directed to inform Gonzalez of their status. Each of the four officers said that he was a witness to the incident involving Mercado.

During the course of the hearing, this Court also heard testimony from Sergeant Manuel Orosa, the immediate supervisor of Officers Camacho and Watson. Orosa stated that Lieutenant Gonzalez ordered him to give a statement on the evening of December 16, 1988. Orosa also testified it was his belief that an officer who refuses to give a statement would be relieved of duty. Orosa further said that this belief was based on his ten years of experience as a police officer and information gained at

---

3. The term "shooting team" is used to designate the group of personnel assembled to investigate in-custody deaths and Officer shootings which involve members of the Miami Police Department.

4. The Defendants have moved to suppress these statements made by Camacho and Trujillo. For the reasons outlined at some length below, we see no basis to suppress these statements under *Garrity*. First, neither Camacho nor Trujillo testified that these statements were made under coercion. Second, there is no indication that

Sergeant Rodriguez ordered either of the Defendants to make a statement. Third, there was no evidence presented that these statements were made pursuant to the advice of counsel, nor that they were made on the well-founded fear that Camacho or Trujillo would be terminated if they invoked their privilege against self-incrimination. Accordingly, Defendants' Motion to Suppress is Denied to the extent that it seeks to suppress the statements made by Camacho and Trujillo.

**1508**

Fraternal Order of Police ("F.O.P.") meetings. Orosa indicated that Lieutenant Gonzalez wanted to know whether he was a witness or a principal and that he felt he had to give a statement. He also said Gonzalez told him that since he was a witness he was not entitled to a lawyer.

Following the initial questioning of the four witness officers by Gonzalez, the officers were told to continue waiting in the Homicide offices along with Officers Trujillo and Camacho. During this period, Homicide officers were engaged in interviews with civilian witnesses to the incident. As the night wore on, the civilians gave varying accounts of the incident involving Mercado. Some of them indicated that some of the officers who were considered to be witness officers may actually have been directly involved in the struggle with Mercado or others at the scene. The facts, however, were murky and unclear as the inquiry proceeded throughout the night and into the next morning.

Later that evening, Sergeant Richard Kinney, President of the local F.O.P. branch, arrived at Homicide. Following his arrival, Robert Klausner, counsel to the F.O.P., reached the offices. Klausner, a Florida lawyer, who had represented the F.O.P. and its members since 1979, testified that he had been involved in many similar inquiries and had represented many officers in the past. He further stated that he was familiar with the City and Miami Police Department's rules and ordinances, and indeed that he had originally been employed as an assistant city attorney. Klausner first spoke with Gonzalez, Homicide Sergeant Gerald Green, and Novick in order to assess the situation before speaking to each of the six Defendants. During this meeting, Klausner was directed by Lieutenant Gonzalez to consult with each of the Defendants in order to make a determination regarding who was directly involved in the incident and who was merely a witnesses. Gonzalez told Klausner that he wanted to know which officers were required to give a statement and which officers might volunteer. Klausner explained that a witness officer is required to give a statement under penalty of being disciplined or fired, and therefore the witness officer has no need for a lawyer, and would be precluded from having a lawyer or union representative present when questioned.

Following a brief discussion with Gonzalez and the others, Klausner spoke with each Defendant in order to make his own determination. These meetings resulted in the determination that Camacho and Trujillo were principals or involved officers and that Haynes, Sinclair, Veal and Watson were witness officers. Since Camacho and Trujillo were classified as involved officers, Klausner determined that Camacho and Trujillo would not be giving statements to the investigating Homicide officers. Klausner then informed Gonzalez of the status of each of the officers. Gonzales told him that each of the witness officers would be giving statements as they were required to do so, and that given their status as witness officers, Klausner could not counsel with them further.

Klausner gave different advice to the four officers who had been classified as witnesses than he gave to Camacho and Trujillo. Klausner told the witness officers that they would be required to give a statement to the investigating officers. The officers were informed that they were compelled to answer in a truthful fashion all questions put to them. Klausner told the officers that under the Miami City Code as well as Police Departmental Orders, the officers would be subject to termination or other disciplinary action for failing to respond to questions asked by the investigators. At the same time, the Defendants were informed that statements made to the investigating officers could not be used as evidence against them in any future criminal proceeding although they could be used in an administrative proceeding. Klausner told each of the four that while a principal could invoke his Fifth Amendment privilege against self-incrimination, a witness officer could not, because nothing the witness officer said could be used against him.

At the hearing before this Court on Defendants' Motion, Klausner explained the bases for his advice to the witness officers that they had *"Garrity* immunity." Klaus-

ner stated that throughout the eleven years during which he has acted as counsel to the F.O.P., he had engaged in many discussions with Lieutenant Gonzalez concerning the obligations of an officer who is deemed to be a witness to answer questions concerning an official investigation. Klausner testified that it was well understood by the homicide detectives and indeed by the witness officers that a witness could not refuse to answer a legitimate inquiry narrowly tailored to his conduct as an officer and that a witness could not invoke the Fifth Amendment privilege and refuse to answer under penalty of being fired. Indeed, Klausner testified that in the past Gonzalez had told him that a witness police officer who refused to answer a question arising in the context of an investigation would be fired. Moreover, Klausner indicated that he was aware of a provision in the City of Miami Code which provides that a civil servant who invokes the Fifth Amendment and refuses to answer or provide information which may bear on his/her fitness to hold a job, would be fired.[5] Klausner testified that the Code as well as departmental orders requiring officers to cooperate in investigations weighed heavily in his decision to advise Defendants Haynes, Sinclair, Veal and Watson that they must give a statement to the investigating officers.

After meeting with the Defendants, Klausner notified Gonzalez that Haynes, Sinclair, Veal and Watson were witness officers. Gonzalez told him that as they were witnesses each of them would be giving a statement. At this time, Klausner informed Gonzalez of his desire to be present during the interrogations of the witness officers. Gonzalez denied this request telling Klausner that departmental standard operating procedure, 2–13 V.b.1, did not allow for attorneys to be present during the statements of witness officers.[6] Gonzalez testified that he not only refused counsel the opportunity to be present when each of the witness officers was questioned but also denied the F.O.P. representative the opportunity to sit in on the interrogations. Indeed, Gonzalez conceded that he may have even said that since it had been determined who the witness officers were, the lawyers could no longer speak with them. His objective, he stated, was to deal directly with the witness officers and not through counsel.

At approximately 11:00 p.m., Klausner left the Homicide offices and was replaced by Ronald Cohen, another F.O.P. counsel. Shortly thereafter, Sergeant Green met with Cohen and informed the attorney that he wished to take preliminary, non-sworn and unrecorded statements from the four witness officers. As Klausner had done earlier, Cohen also expressed a desire to be present during the preliminary interviews.[7] Green denied this request citing again de-

---

5. Section 40–98 of the Miami City Code provides in relevant part:

> (b) Additional grounds for dismissal:
> (1) Should any officer or employee in the classified service of the city appear before a grand jury or juries and refuse to sign an immunity waiver in advance of testimony before such grand jury or juries and/or refuse to testify fully on all matters concerning the property, government, or affairs of the city, such conduct shall constitute a breach of duty and that employee shall be dismissed from the classified service of the city.
> (2) Failure of a city employee to maintain duly established standards of physical fitness shall be grounds for dismissal.
> (3) No City employee shall be excused on plea of self-incrimination, or for any other reason, from giving information which may bear on his/her own fitness to hold a job; he/she shall be dismissed for refusing to give such information.

6. Miami Police Department Standard Operating 2–13 V.b.1 provides:

> b. Sworn statements shall be taken of all witnesses prior to attempting to obtain statement of officer discharging weapon.
> 1. The only persons who may be present during the sworn statements are:
> a) Shooting Team Commander
> b) Lead Investigator/Assistant Investigator
> c) I.S. Investigator
> d) S.A.O. Representative

Notably, this Standard Operating Procedure makes no provision for counsel to be present during questioning.

7. At various times throughout the night Sergeant Kinney, the F.O.P. local president, had requested that he be permitted to be present during the statements of the Defendants. Kinney's requests were also denied. The stated basis for the denials again was that witness officers are not entitled to have an F.O.P. representative present during questioning.

partmental policy which prohibits counsel from being present during statements of witness officers. Additionally, Green informed Cohen of his view that Cohen's representation of the subject officers, Camacho and Trujillo, would create the potential for a conflict of interest if Cohen were to be present during the preliminary interviews of the witness officers.

Following his meeting with Green, Cohen met with each of the witness officers and informed them that they would be required to give a preliminary statement to Green. Cohen also informed the officers that while they were compelled to give statements, the statements given would be immunized under *Garrity*. Cohen advised each of the four that Green would not allow him to be present during the interviews, nor would Green permit F.O.P. President Kinney to sit in on the interviews.

Green proceeded to take preliminary unrecorded statements from officers Sinclair, Haynes, Veal and Watson in that order. Each officer was individually brought into an interview room and directed to give a statement. Sergeant Rodriguez was present with Green during each of the preliminary statements. Following the preliminary statements, Green informed Cohen that formal recorded statements would be taken from the officers. Green also denied Cohen's request to be present during the formal statements. Cohen advised each of the witness officers that they must cooperate fully in giving statements under threat of sanction, including termination. Additionally, Cohen advised the officers that their recorded statements would be subject to *Garrity* immunity. Furthermore, Cohen advised the officers that it was important to state on the record that they were giving the statements under their belief that they would be subject to termination for failing to give a statement.

Officer Sinclair was the first Officer to give a formal statement. Sergeant Green, Detective Rodriguez and Assistant State Attorney Kevin DiGregory, who had replaced Novick as the representative of the State Attorneys' Office, were present when the interrogation commenced at 2:47 a.m. on the morning of December 17, 1988. Following the swearing of Sinclair and the stating of his name, the following colloquy occurred on the record:

SGT. Green: Before we go any further with the statement I'd like to introduce to you Assistant State Attorney Kevin DiGregory, and he'd like to say something to you.

MR. DIGREGORY: Officer Sinclair, as Detective/Sergeant Green told you, I am Assistant State attorney Kevin Digregory. You understand that I am here merely as an observer and that you are in no way—first of all that you're not here under subpoena; that you're not being compelled to give a statement and that you're fully voluntarily giving this statement to Detective/Sergeant Green. You understand?

A Why am I here? Am I facing any possibility of any criminal or administrative action?

MR. DIGREGORY: All I can tell you is that I am here as an observer. I've not subpoenaed you to be here nor are you compelled to give any statement or testimony at this time.

A I'll direct that question to you Sergeant Green.

SGT. GREEN: You're here subject to a request that I am making of an interview into what facts you have concerning an incident that happened at 7th Avenue and 32nd Street. I intend to ask you what occurred prior to it, what occurred during it and a little about what occurred after it.

My investigation is of the nature of trying to establish the circumstances of what led up to the death of a fellow who subsequently became known to us as Leonardo Mercado.

A Okay. Therefore, in fear of losing my job I would be more than happy to answer your questions.

SGT. GREEN: Thank You.

A I was told to say that.

SGT. GREEN: Do you mind telling us who told you?

MR. DIGREGORY: You do understand that I am here merely as an observer and you are not compelled and subpoenaed to give a statement? You understand that?

A I understand that if I don't give a statement I could very well be out of a job. I do understand that I'm compelled now.

MR. DIGREGORY: Do you understand that you are not under any kind of subpoena?

A I don't understand.

MR. DIGREGORY: You understand that my role here is merely the role of observer?

A I believe that.

MR. DIGREGORY: You know that I am an Assistant State Attorney?

A I know you. No problem.

(Questioning resumed by Sgt. Green)

As the foregoing colloquy indicates, Officer Sinclair twice stated his belief that his statement was being given under threat of termination if he were not to give a statement. At one point, Sinclair specifically stated it was his understanding that he was compelled to give a statement. And Sinclair asked whether the inquiry was criminal or administrative in nature. At no time during the interview or after did either Sergeant Green or Assistant State Attorney DiGregory make any effort to dissuade Sinclair of his view that he was compelled to give a statement or answer his question.

Following the conclusion of Sinclair's statement at 3:02 a.m. and prior to the commencement of Officer Haynes' recorded statement at 3:20 a.m., Sergeant Green and Assistant State Attorney DiGregory discussed the reservations which Sinclair had expressed at the beginning of his statement. While DiGregory testified that he could not recall the specifics of the discussion, he remembered deciding that he would modify his statement to the other witness officers. DiGregory specifically decided that he would not say that the officers were not being compelled to give a statement or that their statements were being voluntarily given. In testimony be-fore this Court, DiGregory explained that these deletions in the script were made so as to minimize or avoid the possibility that any of the officers would be inclined to express the view that his statement was not being given voluntarily. At no time during the night or into the next morning did the Assistant State Attorney or Sergeant Green clarify whether the witness officers were testifying voluntarily or under compulsion of being fired if they refused to respond.

In conformity with the change in procedure, at the outset of the recorded statements of Haynes, Veal and Watson, DiGregory only informed the witness that he was not under "subpoena" but made no mention of lack of compulsion or voluntariness. Unlike Sinclair, the record of the interviews of Haynes, Veal and Watson reveal that none of the officers expressed the belief that he was under compulsion to give a statement. The formal statements ended with the conclusion of Watson's statement at 4:12 a.m. In the early morning hours of December 17, 1988, the Defendant officers left the police station. Later that day, all six officers were relieved of duty with pay.

On the afternoon of December 17, 1988, Sergeant Green and Sergeant Luis Albuerne, a member of the Miami Police Department Internal Affairs Division visited Officer Haynes at his residence. The purpose of this visit was to obtain the clothes which Haynes had been wearing at the time of the incident.[8] After a telephonic consultation with Klausner, Haynes refused to relinquish the clothing in the absence of a warrant. After Sergeant Albuerne left and returned with a warrant, Haynes turned over the articles of clothing.

During this visit, Haynes made several statements regarding events which took place both during and after the incident involving Mercado. Notably, Haynes informed the investigating officers of his belief that failure to provide additional information which he had not provided during the earlier statements would result in ter-

---

**8.** Pursuant to a warrant, the investigating officers had previously obtained Veal and Watson's clothing during the morning of December 17, 1988.

mination from his position based on his failure to be truthful. Neither Green nor Albuerne attempted to dissuade Haynes of this view.

Following their visit to Haynes, Green and Albuerne visited Sinclair in order to pick up clothing worn by Sinclair at the time of the incident. Sinclair voluntarily relinquished the clothing. During this meeting, Sinclair stated that he was deeply bothered about the incident and about comments he had read in the paper regarding the incident. Sinclair further indicated that the clothing received by Green during the visit was indeed his clothing.

At the hearing before this Court on the Motion to Suppress, Officers Haynes, Sinclair, Watson and Veal each testified as to his state of mind in giving statements to the investigating officers. Each stated his belief that he was compelled to answer first the question asked by Lieutenant Gonzalez early in the evening, and then the questions during the preliminary interview conducted by Sergeant Green and finally the inquiries during the formal statement taken by Sergeant Green. The officers each testified that the belief that he was compelled to answer was derived from the advice given by attorneys Klausner and Cohen on the night of the incident, instructions given at the Police Academy, information imparted by the Fraternal Order of Police and awareness of various City Code provisions and Departmental Orders. Each of the four Defendants also testified that he was advised and believed that while he was required to answer questions, the statements made to investigating officers could not be used against him in criminal proceedings. Each stated that if he had a choice he would not have answered and instead would have invoked the Fifth Amendment.

Based upon a review of all the evidence presented at the hearing, we find that Defendants Haynes, Sinclair, Veal and Watson in fact believed that they could not refuse to answer the questions put to them by the investigating officers at police headquarters without subjecting themselves to job discipline including termination, that

they could not invoke the Fifth Amendment, and that they believed they were answering under a grant of immunity implied by law under *Garrity*. Moreover, for the reasons stated at some length below we conclude that these beliefs, under all the circumstances of this unusual case, were objectively reasonable.

We believe that for purposes of *Garrity* analysis, the statements made by Haynes and Sinclair at their residences are inseparable from the statements made by the Defendants at the station and must also be suppressed. Nothing occurred between the time that the statements were made at the police station and the time that the statements were made at the officers' residences to dissuade the officers of their subjective beliefs that they were compelled to give statements upon threat of termination. Moreover, there is no indication that any events transpired during this interim which would render these subjective beliefs objectively unreasonable.

In contrast to the statement made by the four witness officers at the police headquarters, we find that the statements made by the six Defendants at the scene were not made under the subjective belief that the statements were compelled. Moreover, even assuming *arguendo* that the statements were somehow made under the subjective belief that the statements were compelled, we find that this belief would not have been objectively reasonable under the circumstances. As discussed below, we find little indicia of compulsion present when the statements were made by the witness officers at the scene of the incident.

### III.

The Fifth Amendment to the Constitution provides, in pertinent part, that "[no person] shall be compelled in any criminal case to be a witness against himself." The Supreme Court has long held that "this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceed-

ing, civil or criminal, formal or informal, where answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465¹ U.S. 420, 426, 104 S.Ct. 1136, 1141, 79 L.Ed.2d 409 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973)). Moreover, in 1964, the Court made the prohibition against compelled self-incrimination applicable to the states through operation of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Thus, there is no question that the protections provided by the Fifth Amendment apply to police officers who are subject to interrogation by other law enforcement officers. *See Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).

■ The protections of the Fifth Amendment are generally not self-executing. "[I]n the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the [Fifth Amendment] privilege, the Government has not 'compelled' him to incriminate himself." *Garner v. United States*, 424 U.S. 648, 654, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370 (1976) (footnote omitted). *See also Murphy*, 465 U.S. at 427–29, 104 S.Ct. at 1142–43. However, "application of this general rule is inappropriate in certain well-defined situations." *Id.* at 429, 104 S.Ct. at 1143. "In each of those situations ... some identifiable factor was held to deny the individual a 'free choice to admit, to deny, or to refuse to answer.'" *Id.* (citing *Garner*, 424 U.S. at 657, 96 S.Ct. at 1183–84). The two main exceptions to the general rule that the privilege must be claimed when self-incrimination is threatened are situations where a

suspect is in police custody and cases where the assertion of the privilege is penalized so that the option to remain silent is foreclosed and the incriminating testimony is effectively compelled. *Id.* at 429–34, 104 S.Ct. at 1143–46. Incriminating evidence obtained under either of these circumstances must be excluded absent a knowing and willful waiver on the part of the suspect. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding incriminatory statements made by defendant while in police custody to be inadmissible in the absence of a knowing and willful waiver); *Garrity, supra* (holding incriminatory statements made under threat of termination for remaining silent to be inadmissible in the absence of a knowing and willful waiver). The exception at issue in the instant case is the so-called "penalty" exception.[9]

The watershed Supreme Court case which established the "penalty" exception is *Garrity v. New Jersey, supra*. *Garrity* arose out of an investigation conducted by the New Jersey Attorney General concerning alleged fixing of traffic tickets. As part of the investigation, the defendant police officers were questioned by investigators from the Attorney General's Office. Prior to the commencement of the questioning, each defendant was given the following warnings: (1) that anything he said might be used against him in any state criminal proceeding; (2) that he had a privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office.[10] *Garrity*, 385 U.S. at 494, 87 S.Ct. at 617.

---

**9.** The Defendants have apparently abandoned any claim that their statements are inadmissible under the "police custody" exception. The requirements of *Miranda* do not apply absent a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (citation omitted). There is no dispute that the Defendants were not under formal arrest during the time that any of the contested statements were made. Moreover, the Defendants have conceded, and in any event we are fully convinced, that any restraints put on the Defendants' movement at

the time the statements were made did not rise to the level of restraint associated with a formal arrest.

**10.** The threat of removal from office was apparently made pursuant to N.J.Rev.Stat. § 2A:81–17.1 (Supp.1965) (repealed) which provided as follows:

"Any person holding or who has held any elective or appointive public office, position or employment (whether state, county or municipal), who refuses to testify upon matters relating to the office, position or employment in any criminal proceeding wherein he is a defendant

The defendants did not invoke the Fifth Amendment and answered the investigators' questions. Over the defendants' objections, some of their statements were used in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws. Following their convictions, the defendants appealed claiming that their statements were coerced by reason of the fact that if they failed to answer they could be subject to forfeiture of their positions as police officers. *Id.*

In reversing the defendants' convictions, the Supreme Court noted that "[t]he choice given [the defendants] was either to forfeit their jobs or to incriminate themselves." *Id.* at 497, 87 S.Ct. at 618–19. The Court observed that "[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or remain silent." *Id.* In determining that the statements were inadmissible the Court found that the practice of the state was " 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' " *Id.* (quoting *Miranda*, 384 U.S. at 464–65, 86 S.Ct. at 1622–23). The Court concluded by holding that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of the body politic." *Id.* at 500, 86 S.Ct. at 1641.

In subsequent cases the Supreme Court has made it clear that its holding in *Garrity* is limited to instances where an interviewee is coerced into waiving his constitutional right against self-incrimination through the threat of dismissal. *Garrity* manifestly does not prohibit the state from compelling an employee from answering questions directly and narrowly related to his duties, provided that he is not coerced into relinquishing his privilege against self-incrimination. *Gardner v. Broderick*, 392 U.S. 273, 278, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968); *Uniformed Sanitation Men Association v. Commissioner*, 392 U.S. 280, 283–85, 88 S.Ct. 1917, 1919–20, 20 L.Ed.2d 1089 (1968); *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). *See also, Murphy*, 465 U.S. at 435–39, 104 S.Ct. at 1146–49 (distinguishing case where defendant was ordered to give statement but was not coerced into relinquishing privilege against self-incrimination from *Garrity*, where defendants were compelled both to give statements and to waive Fifth Amendment privilege).

■ Fifth Amendment law for public employees attempts to strike a balance between the employee's privilege against self-incrimination and the state's interest in obtaining information necessary for the advancement of governmental functions. *Lefkowitz v. Turley*, 414 U.S. 70, 81, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). *See generally*, Warnken, *The Law Enforcement Officers' Privilege Against Compelled Self–Incrimination*, 16 U.Balt.L.Rev. 452 (1987). In short, the state has a choice between either demanding a statement from an employee on job-related matters, in which case it can not use the statements in a criminal prosecution, or prosecuting the employee, in which case it cannot terminate

---

or is called as a witness on behalf of the prosecution, upon the ground that his answer may tend to incriminate him or compel him to be a witness against himself or refuses to waive immunity when called by a grand jury to testify thereon or who willfully refuses or fails to appear before any court, commission or body of this state which has the right to inquire under oath upon matters relating to the office, position or employment of such person or who, having been sworn, refuses to testify or to answer any material question upon the ground that his answer may tend to incriminate him or compel him to be a witness against himself,

shall, if holding elective or public office, position or employment, be removed therefrom or shall thereby forfeit his office, position or employment and any vested or future right of tenure or pension granted to him by any law of this state provided the inquiry relates to a matter which occurred or arose within the preceding five years. Any person so forfeiting his office, position or employment shall not thereafter be eligible for election or appointment to any public office, position or employment in this state." *See Garrity*, 385 U.S. at 494 n. 1, 87 S.Ct. at 617 n. 1.

the employee for refusing to give a statement. The state may demand that an employee give a statement on pain of dismissal even if the statement may tend to incriminate. An employee may then be fired either for refusing to give answers or on the basis of the answers which are given. However, the state may not use coerced answers in a criminal proceeding. *D'Acquisto v. Washington*, 640 F.Supp. 594, 622–23 (N.D.Ill.1986).

■ Where the state has directly presented the defendant with the Hobson's choice of either making an incriminating statement or being fired, application of *Garrity* to suppress the statement is clearcut. However, in cases where the state did not make a direct threat of termination, application of *Garrity* becomes more problematic. In *United States v. Friedrick*, 842 F.2d 382 (D.C.Cir.1988), the defendant was not directly threatened with termination for refusing to give statements. However, the defendant argued that *Garrity* was applicable because a threat of termination for refusing to give a statement was strongly implied. In upholding the district court's suppression of statements made by the defendant, the D.C. Circuit set forth a two-pronged test to determine the applicability of *Garrity*. First, the defendant must have subjectively believed that he was compelled to give a statement upon threat of loss of job. Second, this belief must have been *objectively reasonable* at the time the statement was made. *Id.* at 395. We believe that this test accurately reflects the teachings of *Garrity* and its progeny and provides a useful mode of analysis in the instant case. At argument before this Court, both Defendants and the Government agreed that these two prongs now constitute an appropriate test for the determination of claims of "penalty" coercion.

In light of the facts of this case, we underscore that a necessary prerequisite to concluding that a subjective belief is objectively reasonable is that the belief derived from actions taken by the state. A subjective belief that *Garrity* applies will not be considered objectively reasonable if the

state has played no role in creating the impression that the refusal to give a statement will be met with termination of employment. *See e.g., United States v. Solomon*, 509 F.2d 863, 871–72 (2nd Cir.1975) (Friendly, J.) (drawing distinction between *Garrity* and case where threat was made by a non-state actor and finding that "[i]t is settled law that the common law rule excluding confessions induced by a threat is limited to inducement by 'a person in authority'; what is generally required is a 'legal interest in the prosecution' and 'not the mere existence of actual control or influence growing out of the social or commercial relations of the persons.'" (citation omitted)); *United States v. Montanye*, 500 F.2d 411, 415 (2nd Cir.1974) ("The controlling factor is ... the fact that the state has involved itself in the use of substantial economic threat to coerce a person into furnishing an incriminating statement.").

## IV.

■ Applying these standards here, we conclude that the Defendants Haynes, Sinclair, Veal and Watson subjectively believed that they were compelled to answer upon threat of job loss, that under the circumstances of this case this belief was objectively reasonable, and that the conduct of the state was substantially involved in creating the belief that refusal to answer would be met with termination of employment. Ultimately, in determining whether the Defendants' statements were made voluntarily or were the product of coercion, we must examine the totality of the circumstances surrounding the statements. *Blackburn v. Alabama*, 361 U.S. 199, 248, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Sullivan v. State of Alabama*, 666 F.2d 478, 482–83 (11th Cir.1982). An examination of the circumstances surrounding the statements given following the Defendants' return to the police station on the evening of December 16, 1988, compels the conclusion that the statements of Defendants Haynes, Sinclair, Veal and Watson were given under the clear threat of termination and therefore must be suppressed. While the statements given by the Defendants Haynes, Sinclair, Watson and Veal subse-

quent to their arrival at the station and after consulting with counsel must be suppressed, we conclude on a full review of the record that the statements made by all six Defendants *at the scene* were voluntary and are admissible. We make this determination after examining the totality of the facts and circumstances surrounding the statements made by the Defendants.

To begin with, §§ 40–98(b)(1) and 40–98(b)(3), which became part of the City Code in 1979, specifically provide for the dismissal of city employees who invoke their Fifth Amendment privilege against self incrimination. During argument before this Court, the Government conceded that these code provisions are essentially identical to the forfeiture statute in effect in New Jersey at the time the events in *Garrity* took place.[11]

Moreover, the Government admitted that if the statute were applicable here and was communicated to the Defendants, *Garrity* immunity would apply because the Defendants would be compelled to give a statement. However, the Government apparently contends that because the Defendants were not directly informed of the statute by investigating officers, the existence of the statute does not mandate that the Defendants' statements are protected by *Garrity* immunity. Moreover, the Government claims that the statute ought not to be applied to the Defendants because the statute only applies to employees who are the subject of internal investigations.

While we do not adopt the view of the Court in *Holloway v. State,* 26 Md.App. 382, 383, 339 A.2d 319 (1975) that the mere

existence of a departmental policy of disciplining those officers who refuse to give statements always operates as a matter of law to render officer statements involuntary, in this case the existence of this provision of the Miami City Code is relevant to the determination of whether the Defendants statements were given voluntarily. *See Garrity,* 385 U.S. at 496, 87 S.Ct. at 618 (finding that existence of forfeiture-of-office statute bears on the voluntary nature of defendants' statements).

The Defendants do not claim that the investigators ever specifically threatened application of the forfeiture of office ordinance. However, we credit the testimony of Defendants Haynes, Sinclair, Veal and Watson that they were aware of the fact that an ordinance existed which provides for the termination of a city employee who attempts to invoke the Fifth Amendment.[12] Additionally, Richard Kinney, the F.O.P. President, testified that the F.O.P. regularly instructs its members as to the forfeiture of office statute. Moreover, Robert Klausner testified unequivocally—and we credit his testimony—that on the night of the incident he advised Defendants Haynes, Sinclair, Veal and Watson that the applicable rules and regulations prohibited witness officers from invoking their privilege against self-incrimination, that they would have to answer all questions truthfully and finally that if they refused to answer they would be fired.[13] In short, while Haynes, Sinclair, Veal and Watson were not directly told of the ordinance by the investigators, there is sufficient credible evidence that the Defendants were independently aware of the ordinance. Thus,

---

**11.** Several courts have found forfeiture of office statutes similar to § 40–98 to be unconstitutional under *Garrity*. *See e.g. Sellers v. Culbertson,* 224 So.2d 808 (Fla. 3 DCA 1969) (Dade County conceding that County forfeiture of office statute is unconstitutional under *Garrity*); *Englander v. State,* 246 So.2d 746 (Fla.1971) (holding Dade County Charter provision which provided for forfeiture of office of any employee who refuses to sign waiver of immunity when called to testify before grand jury to be unconstitutional under Garrity); *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975) (invalidating City Charter provision providing for forfeiture of office where City employee asserts Fifth

Amendment privilege and ruling statements obtained through threat of application of provision inadmissible).

**12.** We note in passing that no such testimony was adduced from Defendants Camacho and Trujillo, who did not testify at the hearing on this motion.

**13.** We also note that no testimony was adduced from Klausner as to what he told Defendants Camacho and Trujillo. He testified only that he concluded that they were "hands on" officers or principals and accordingly advised them to remain silent.

we may fairly conclude that the existence of the ordinance caused the Defendants to subjectively believe that refusal to give a statement would be upon pain of termination. The fact that the Defendants gained knowledge of the existence of the City ordinance through non-state sources does not eradicate the coercive effect of the existence of the ordinance. See *Montanye*, 500 F.2d at 415.

Nevertheless, the Government contends that even if subsection § 40–98(b)(3) played a role in creating the subjective belief that the Defendants were compelled to give statements, that belief was not objectively reasonable because the subsection applies only to employees who are the subject of internal investigations. We are unpersuaded by this argument. Nothing on the face of this subsection supports the Government's view. In fact, this subsection is grouped together with subsection 40–98(b)(1), dealing with refusal to sign a waiver during a grand jury proceeding, which is manifestly applicable outside the scope of internal investigations. Moreover, the Government has cited us to no extrinsic evidence or case that support its interpretation. We see no factual or logical reason why statements made during a criminal investigation may not be construed to bear on an employees fitness to hold a job.

The Defendants have also cited us to Miami City Code § 40–98(a)(5), which provides that a city employee who is guilty of insubordination may be subject to dismissal, suspension or demotion.[14] We are not persuaded, however, by Defendants' claim that an ordinance simply punishing insubordination standing alone acted to coerce the Defendants into giving their statements. A statute is not coercive for Fifth Amendment purposes by merely commanding that an employee give a statement if a statement is requested by a superior. The teachings of *Garrity* mean at least this: in order to be coercive for Fifth Amendment purposes, the statute must be applied to punish an employee for invoking the Fifth Amendment. See *Murphy*, 465 U.S. at 435–39, 104 S.Ct. at 1146–49. There is no evidence on the record that the statute has been applied to an employee who exercises his Fifth Amendment right against self-incrimination. We do not believe that the insubordination statute alone coerced the Defendants into not invoking their Fifth Amendment rights. *See United States v. Indorato*, 628 F.2d 711, 715–716 (1st Cir. 1980) (finding no coercion by similar insubordination statute where there was no evidence on the record that statute punishing insubordination would be applied to punish an employee who elects to invoke the Fifth Amendment). However, we do observe that the insubordination ordinance is in fact coupled here with the City ordinance which squarely prohibits the invocation of the Fifth Amendment privilege and with the unequivocal advice of counsel.

Defendants Haynes, Sinclair, Veal and Watson also persuasively argue that they felt they were required to give a statement based upon the advice of counsel. Attorney Klausner testified that his advice to the officers was to answer truthfully every question put by the investigating officers, under penalty of job loss. Each of the four witness officers testified that Klausner and Ronald Cohen informed them that they must give statements and answer every question put by the investigators, that they

. § 40–98 provides as follows:

(a) *Generally.* The following are declared to constitute a breach of duty and to be grounds for dismissal or suspension from the classified service or grounds for demotion, though charges may be based upon causes other than those enumerated; viz, that any employee has been guilty of conduct unbecoming any employee of the city who:

(5) Has violated any lawful and reasonable official regulation or order, or failed to obey any lawful or reasonable direction made and given by his/her superior, where such violation or failure to obey amounts to an act of insubordination or a serious breach of proper discipline, or resulted, or reasonably might be expected to result, in loss or injury to the city or to the public or to the prisoners or wards of the city;

Defendants have further cited us to Departmental Order 11.6.33.2 which mandates that officers obey the orders of their superiors and Departmental Orders 2.3 and 11.6.14.2 which require officers to cooperate in investigations and interdepartmental matters respectively.

could not invoke the Fifth Amendment, and that they had *Garrity* immunity.

Based on the advice of counsel, the officers subjectively believed that they were forced to answer all questions put by the investigators and could not assert their Fifth Amendment privilege without jeopardizing their employment. However, in determining the impact of the advice given to the Defendants and whether it was objectively reasonable for purposes of *Garrity* analysis, we must also look at the basis for the advice. The Defendants could not be viewed as having been coerced if their attorneys based their advice solely on beliefs arrived at independently from actions taken by the state, rather than on beliefs derived from state action. Advice of counsel, alone, may not provide the Defendants with a claim that they have been coerced into giving statements. There must be some demonstrable state conduct which lead Klausner and Cohen to fairly advise their clients in the manner they did. Otherwise, a defense lawyer could effectively confer use immunity on a client without any state action.

In this case, however, it is clear that the attorneys' advice to Defendants Haynes, Sinclair, Veal and Watson was solidly grounded in information derived from actions of the state. We have specifically credited Klausner's testimony that over his eleven years as counsel to the F.O.P., he had engaged in numerous discussions with Lieutenant Gonzalez and had been informed by Gonzalez that a witness officer who refused to answer questions would be subject to disciplinary measures including termination. Second, Klausner testified that his advice to the Defendants was also based on his interpretation of the City ordinances and Miami Police Department regulations.

In sum, we credit the Defendants Haynes, Sinclair, Veal and Watson's testimony that they subjectively believed that their statements were compelled on advice of their attorneys, and we are convinced that the attorneys' advice to them was solidly grounded in action taken by the state. Accordingly, we find that the advice of counsel rendered in this case to Defendants Haynes, Sinclair, Veal and Watson provides a further basis for these Defendants to have reasonably believed that they were compelled to waive their Fifth Amendment rights during their interviews with the investigating officers.

Our conclusions are strengthened still further by the actions of the investigators and the prosecutor on the night of the December 16th and the morning of December 17th. First, we have found as a fact that the Defendants were not asked to give statements, but rather, were directed by Lieutenant Gonzalez to give statements. Furthermore, the Defendants were kept under surveillance and escorted as they moved about the homicide offices throughout the night and into the next morning. The overall treatment by the officers following their return to the police station heightened the impression that the officers were being compelled to make statements. More significantly, during his formal statement, Officer Sinclair twice explicitly informed the interviewers of his belief that his statement was compelled, due to his fear of losing his job. At no time during the interview, or afterwards did Sergeant Green or Assistant State Attorney DiGregory make any effort to disabuse or correct Sinclair of his belief that his statement was being made under compulsion. Indeed, no effort was made by DiGregory or Green to even answer Sinclair's question as to whether the inquiry was administrative or criminal in nature.

The Government can hardly be heard to persuasively claim that Sinclair's statement was made voluntarily when the investigators did nothing to dissuade Sinclair from his unequivocal, recorded claim that his statement was being made under compulsion of losing his job and did not correct the record. The reasonable inference which must be drawn from the interviewers' actions—and we draw that inference now—is that they believed that if they informed Sinclair that he was not under compulsion to give a statement, if they had plainly and honestly told him that he could invoke his Fifth Amendment privilege without being fired, he would have refused to

go forward with the statement. Rather than risk not obtaining a statement, the interviewers intentionally told Sinclair nothing and failed to disabuse him of his belief as to his status. Indeed, if the investigators had truly believed that Sinclair was giving his statement wholly voluntarily, we think they would have eagerly answered him. We add that at the time of Sinclair's formal statement, the investigators had developed some reason to believe that Sinclair and the other "witness" officers may have played a more substantial role. Moreover, by the afternoon of December 17th each of the officers was relieved of duty. At all events we are hard pressed to view Sinclair's statements as truly voluntary when the investigators neither answered him nor clarified the record. *See Friedrick*, 842 F.2d at 400.

Following the completion of Sinclair's recorded statement, DiGregory and Green discussed Sinclair's statement regarding compulsion. At the hearing, DiGregory testified that his preamble regarding voluntariness and compulsion was intentionally dropped in order to avoid flagging the issue of voluntariness before the other witness officers. In our view this action speaks louder than Green and DiGregory's professed belief that Haynes, Sinclair, Watson and Veal gave their statements in a wholly voluntary manner. If Green and DiGregory believed that the witness officers were giving statements wholly voluntarily, reason suggests they would not have been so fearful about stating this clearly on the record, particularly after Sinclair stated on the record that he was com-

pelled to speak. Undoubtedly the investigators' central aim was to take a statement first and litigate its admissibility in a courtroom later. While it is clear that " '[t]he Constitution does not forbid the asking of incriminative questions,' " *Minnesota v. Murphy, supra*, 465 U.S. at 428, 104 S.Ct. at 1142, 79 L.Ed.2d at 420 (quoting *United States v. Monia*, 317 U.S. 424, 433, 63 S.Ct. 409, 413, 87 L.Ed. 376), and that a witness or even a target in a grand jury context need not be given any *Miranda* warnings at all before being questioned, under the facts of this case, the unwillingness of the prosecutor or the interrogating officer to plainly and honestly answer Sinclair's well-founded fear surely bears heavily upon the voluntariness of the statements given.

Finally, the voluntariness of the statements given by Defendants Haynes, Sinclair, Veal and Watson at police headquarters is further undermined here by the absence of counsel during the interrogations.[15] At several times during the course of the night, both attorneys for the F.O.P., Klausner and Cohen, F.O.P. representative Kinney, and the witness officers requested permission for counsel to be present during the statements of the four witness officers. The investigators denied each of these requests.[16] Lieutenant Gonzalez testified that the officers were denied counsel pursuant to departmental policy. Gonzalez also stated that the officers had no "need" for the presence of counsel during questioning, because they were considered witness officers. The most powerful inference to be drawn from Gonzalez's testimo-

---

**15.** Courts have recognized that a request or the absence of a request by a defendant to contact or have an attorney present is a factor bearing on the determination of voluntariness of statements made in the course of interrogation by police officials. *United States v. Phillips*, 812 F.2d 1355 (11th Cir.1987) (In finding that the defendant was not in custody for purposes of Miranda, the Court relied, in part, on the fact that defendant "never requested a lawyer or to terminate the interview."); *United States v. Okwumabua*, 828 F.2d 950 (2nd Cir.1987) (The Court performed an examination of the totality of the circumstances in order to determine the voluntariness of defendant's statements. As one of the surrounding circumstances the court stated that "[a]t no time during the interview did

[the defendant] express a desire to contact his attorneys.").

**16.** We note that the denial of counsel to the officers may have violated Fla.Stat. § 112.532(1)(i) which provides that:

At the request of any law enforcement officer or correctional officer under investigation, he shall have the right to be represented by counsel or any other representative of his choice, who shall be present at all times during interrogation whenever the interrogation relates to the officer's fitness for law enforcement service or correctional service.

The Florida statute, however, would provide no basis for suppressing these statements.

ny, and indeed from the decision to bar counsel under circumstances such as these, is that the presence of counsel for witness officers is thought to be *unnecessary* since truthful statements given by witness officers are protected by *Garrity* immunity. Moreover, we believe that the presence of counsel may have been denied due to the investigators' concern that if counsel were present, the witness officers would state on the record that their statements were being made under compulsion. At all events the absence of counsel, after numerous specific requests were made, throughout the night of December 16 and into the early morning of the next day undermines still further the claimed voluntariness of the statements.

It is true that the investigators may have also believed that the F.O.P. attorneys' representation of the subject officers at the same time they represented witnesses might lead to a conflict of interest. But ultimately any conflict was surely for the witness officers and "hands on" officers to resolve with their counsel. In any event, at a minimum the denial of the presence of attorneys increased the likelihood that the officers subjectively believed they were under compulsion to give statements.

Nevertheless, the Government has argued that *Garrity* is not applicable in the instant case because none of the Defendants were directly threatened with termination for refusing to give statements. The former Fifth Circuit has noted that *Garrity* may be applied to render statements inadmissible even where the threat of termination is implied rather than explicit. *Womer v. Hampton*, 496 F.2d 99, 108 (5th Cir.1974). *See also Montanye*, 500 F.2d at 415 ("The state is prohibited ... from compelling a statement through economically coercive means, whether they are direct or indirect."). In determining whether statements have been made involuntarily due to the threat of termination, "[s]ubtle pressures may be as telling as coarse and vulgar ones." *Hester v. City of Milledgeville*, 777 F.2d 1492, 1495 (11th Cir.1985) (citing *Garrity*, 385 U.S. at 496, 87 S.Ct. at 618). While the application of *Garrity* becomes a subtler exercise in the absence of direct threats of termination, we believe that in this case the totality of the circumstances fully warrants the application of *Garrity*. The critical circumstances leading to that conclusion include the explicit language of the City ordinance, the clear advice of counsel based on the ordinances and consultations with homicide officers, the refusal to permit counsel to be present at all interrogations, and the conduct of the state attorney and interrogating agents before and during the course of the recorded statements. Therefore, we hold that the Defendants Haynes, Sinclair, Veal and Watson subjectively believed that failure to answer would result in termination, that they believed they could not invoke the Fifth Amendment without being fired, that these beliefs under the facts of this case were objectively reasonable, and that the actions of the State were directly implicated in creating this belief. Accordingly, the Defendants' Motion to Suppress the statements taken from the Defendants Haynes, Sinclair, Veal and Watson subsequent to their arrival at the police station is GRANTED.

## V.

■ In contrast to the statements made after the Defendants arrived at the police station, we have little trouble in determining that the brief statements made by the Defendants at the scene of the incident are not properly suppressed under *Garrity*. In the first place, none of the Defendants testified that they felt compelled to give a statement to Sergeant Orosa at the scene. We can find no basis to suppress these statements where the record does not indicate that the Defendants believed they were under compulsion when they made some brief comments to their colleague at the crime scene. Defendants Haynes, Sinclair, Veal and Watson did not testify that any statement they may have made to Sergeant Orosa or to Officer Aguilar was the product of coercion. Additionally, neither Defendant Camacho nor Defendant Trujillo testified at all.

In the second place, the circumstances at the time the statements were made at the scene were sharply different from those

surrounding the Defendants' statements after arrival at the station house. At the scene, the Defendants had not yet been subject to surveillance and restraints on their movement throughout the night. The Defendants were not called into Homicide offices and *directed* to give a recorded statement under oath. Their comments were made to their immediate superiors and colleagues. Indeed, the statements were made before a homicide team had been put together and before any formal effort was made to discern between witness officers and hands on officers. In fact, the statements were made before the state attorney or F.O.P. attorneys had arrived at the Homicide offices. In the third place, the Defendants had not been advised by F.O.P. counsel that they were compelled to give a statement at the scene of the crime; nor were they advised that if they refused to speak they could be fired. The well-founded advice of counsel constituted a large part of the compulsion which the Defendants Haynes, Sinclair, Veal and Watson felt during questioning at the station. The advice of counsel was simply not a factor bearing on the Defendants' decision to furnish statements at the scene.

In the fourth place, the on-scene statements were not made after one of the officers stated that he felt compelled to answer under penalty of job termination, and after the investigative authorities took no steps to clarify the status of the witnesses. Moreover, the on-scene statements were made before any civilian witnesses had provided any accounts of wrongdoing on the part of the Defendants. Nor, were the on-scene statements made in the context of formal interrogations, after counsel had been denied the opportunity to be present during the questioning. Finally, there is no evidence that the state induced any belief that the statements made on the scene were the product of fear of job loss.

In brief, there is precious little reason to believe that any of the Defendants felt any compulsion to give a statement and waive their Fifth Amendment privilege at the time the statements were taken at the scene. We reiterate, the mere fact that the Defendants may have felt compelled to give a statement at the scene to their colleagues and superiors as a normal part of their duties as police officers is not enough to invoke *Garrity.* In addition, the Defendants must have acted under an objectively reasonable, belief that they would be terminated for refusing to answer an inquiry based on their Fifth Amendment privilege. *See Gardner,* 392 U.S. at 278, 88 S.Ct. at 1916; *Sanitation Men,* 392 U.S. at 283-85, 88 S.Ct. at 1919-20; *Murphy,* 465 U.S. at 435-39, 104 S.Ct. at 1146-49. The evidence presented at the hearing does not establish that any of the on-scene statements met these standards.

Accordingly Defendants' Motion to Suppress is DENIED to the extent that it seeks to suppress statements made at the scene of the incident. Moreover, Defendants Camacho and Trujillo's Motion is DENIED in all respects because they have failed to show any *Garrity* violations. The Defendants Haynes, Sinclair, Veal and Watson's motion is GRANTED, however, to the extent that it seeks to suppress all statements made subsequent to their arrival at police headquarters.

DONE AND ORDERED.