# Third District Court of Appeal

## State of Florida

Opinion filed April 10, 2019.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D18-783
Lower Tribunal No. 16-3995
_____

**The State of Florida,**
Appellant,

vs.

**Armando Socarras,**
Appellee.

An appeal from a non-final order from the Circuit Court for Miami-Dade County, Veronica Diaz, Judge.

Ashley Moody, Attorney General, and Rachel Kamoutsas, Assistant Attorney General, for appellant.

The Martinez Law Center, and Edward A. Martinez, for appellee.

Before SALTER, SCALES, and MILLER JJ.

MILLER, J.

The State appeals the trial court's order granting a motion to suppress three separate post-Miranda[1] statements made by appellee, Armando Socarras. The trial court found all three statements were improperly compelled in violation of Garrity v. New Jersey, 385 U.S. 493, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967). Applying a well-reasoned body of binding jurisprudence and the text of the United States Constitution, we conclude the trial court erred in suppressing two of the three statements under review, thus we reverse in part and affirm in part.

## FACTS

In 2016, the Miami-Dade Police Department ("MDPD") initiated an investigation into allegations of corruption within its Narcotics Bureau. In an effort to ascertain the identity of the purportedly corrupt law enforcement officers, the Criminal Conspiracy Section of MDPD's Professional Compliance Bureau orchestrated a clandestine "sting operation." MDPD rented a motel room and designated an undercover police officer from the Orlando Police Department to pose as a drug peddler. The undercover officer was furnished with $3,113.00 in pocket cash, an altered identification card, and two bags containing illegal narcotics and $14,314.00 in currency. Officers marked the money with fluorescent powder and recorded the serial numbers reflected on each banknote.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

Socarras, a ten-year veteran of MDPD, was a member of the Narcotics Bureau. On the evening of the sting operation, Socarras's partner, Edwin Diaz, received a "tip" from a confidential informant regarding a male subject selling narcotics out of the motel room. Socarras and his squad responded to the location and arrested the undercover officer outside of the motel room. A search incident to arrest yielded a wallet containing cash and narcotics. Diaz obtained a search warrant and the two bags containing currency and narcotics were recovered from inside of the motel room. All evidence was designated for impoundment.

Socarras was tasked with inventorying and impounding the narcotics and currency. He and Diaz drove to the Property and Evidence Bureau (the "Bureau") to impound the property. Two sergeants were waiting at the Bureau to verify the inventory of the impounded property. After Socarras and Diaz left, the sergeants discovered $1,300.00 of the seized currency was missing.

Shortly after driving away from the Bureau, Detective David Colon detained Socarras. Colon was dressed in plainclothes and driving an undercover police vehicle, but had a police badge prominently displayed around his neck. He pulled behind Socarras's vehicle and activated his emergency lights. Colon drew his

firearm, ordered Socarras out of his vehicle at gunpoint, and identified himself as an internal affairs officer.[2]

After Socarras exited his vehicle, he was subjected to a protective pat-down, relieved of his service weapon, and placed in the back seat of Colon's undercover police vehicle. A backup officer arrived and handcuffed Socarras. While Socarras was on the scene, his automobile was wrapped in police evidence tape and impounded. Officers obtained a search warrant and located the missing $1,300.00 inside of a compartment located in Socarras's automobile.[3]

Socarras was transferred to the back of a marked police cruiser and transported to the MDPD Professional Compliance Bureau. Upon arrival, he was scanned with ultraviolet light to determine the absence or presence of fluorescent powder. He was initially placed in the cafeteria, and then moved to Colon's office. While in Colon's office, Socarras became ill. Colon walked Socarras to the bathroom, where Socarras vomited. Socarras was then returned to Colon's office, where he again vomited. Colon provided Socarras with access to a telephone.

Socarras was administered his <u>Miranda</u> warnings, orally and through a standard written <u>Miranda</u> waiver form, which he signed and initialed accordingly.

---

[2] Colon was a detective in the Public Corruption Section of the Internal Affairs Bureau, which handles criminal investigations involving law enforcement officers.
[3] The serial numbers on the recovered currency matched those recorded prior to the sting operation.

Socarras then made an initial verbal statement. Approximately four hours later, he submitted to a recorded formal interview. During the interview, Socarras, unprompted, stated he inadvertently neglected to impound some of the currency. The recording device was then deactivated. Forty minutes later, Socarras provided his third and final statement to law enforcement, wherein he disclosed he was experiencing financial difficulties and confessed to purloining the money.

Socarras was charged with grand theft. He sought suppression of all three of his statements, contending they were improperly compelled in violation of his Fifth Amendment privilege against self-incrimination. The trial court conducted an evidentiary hearing on the merits of the suppression motion and subsequently issued a written order. The court rendered the following factual findings:

> Socarras was never told that Fryer and Appleby were conducting a criminal investigation. When Colon pulled Socarras over, he identified himself as IA. Socarras was not cuffed, but simply placed in the back seat of a police car. When it was time to be transported to the IA office, a second officer shows up to the scene, also states he is an IA officer and cuffs him, because that's the policy. Prior to going on the record during the first interview, Fryer tells Socarras that this is an internal affairs investigation. During the second interview, shortly after disclosing that he had forgotten to inventory the money he found in the bag of drugs, Socarras states, "[expletive], man. Is that why we're here?" Fryer responds, "I'm here asking you questions. That's it."

The trial court granted suppression, concluding Socarras reasonably believed he was compelled to give all three statements under threat of job loss, thus, the statements were improperly coerced in violation of Garrity. This appeal ensued.

5

## LEGAL ANALYSIS

"We defer to a trial court's findings of fact as long as they are supported by competent, substantial evidence, but we review de novo a trial court's application of the law to the historical facts." Ross v. State, 45 So. 3d 403, 414 (Fla. 2010) (citing Cuervo v. State, 967 So. 2d 155, 160 (Fla. 2007)). When a claim is made that the conduct of interrogating law enforcement officials overbore a fellow officer's will to resist, bringing about a confession not freely self-determined, the reviewing court must "examine the entire record and make an independent determination of the ultimate issue of voluntariness." Davis v. North Carolina, 384 U.S. 737, 741-42, 86 S. Ct. 1761, 1764, 16 L. Ed. 2d 895 (1966) (citing Haynes v. Washington, , 373 U.S. 503, 515-16, 83 S. Ct. 1336, 1344-45, 10 L. Ed. 2d 513 (1963); Blackburn v. Alabama, 361 U.S. 199, 205, 80 S. Ct. 274, 279, 4 L. Ed. 2d 242 (1960); Ashcraft v. Tennessee, 322 U.S. 143, 147-48, 64 S. Ct. 921, 923, 88 L. Ed. 1192 (1944)).

Historically, "[t]he right against self-incrimination originated in the maxim *nemo tenetur seipsum prodere* ('no man shall be compelled to incriminate himself')." Andrew J. M. Bentz, The Original Public Meaning of the Fifth Amendment and Pre-Miranda Silence, 98 Va. L. Rev. 897, 899-900 (2012) (emphasis added) (citation omitted). The formal adoption of the privilege against self-incrimination emanated from a litany of abuses perpetrated by instrumentalities of the British Crown:

> The privilege articulated in the Fifth Amendment finds its origin and can be traced back to the thirteenth century. The enlightening history of the rule is concisely reviewed in McCormick on Evidence ss 115—118 (2d Ed. 1972). According to these authorities, the popularity of the privilege against self-incrimination in England sprang from the impact of the ecclesiastical courts and the courts of the Star Chamber and High Commission. Torture attended the victim-defendant's interrogation and his compulsory testimony became the vehicle for the rise of dictatorial Kings and the suppression of religious diversity. The common law courts responded with the theory that it was inherently improper to compel testimonial response by the accused to charges against him.

Clark v. State, 256 Ark. 658, 659-60 (1974) (internal citations omitted). "Virginia's *Declaration of Rights*, a preface to the 1776 Virginia Constitution authored by George Mason, included the right to silence." Asherman v. Meachum, 957 F.2d 978, 990-92 (2d Cir. 1992) (citation omitted). "Nonetheless, at the Constitutional Convention there were dark warnings that nothing in the initial draft [of the Constitution] prevented Congress from establishing 'that diabolical institution, the Inquisition.'" Id. at 991 (quoting Leonard Levy, Origins of the Fifth Amendment 417 (1968)). Accordingly, in 1789, James Madison drafted the Fifth Amendment, drawing upon Virginia's *Declaration of Rights*. Id. "When the Bill of Rights was ratified in 1791 the enshrinement of the ancient maxim *nemo tenetur* into a constitutional right to remain silent was completed." Id. (citation omitted).

"The Fifth Amendment Self-Incrimination Clause, which applies to the States via the Fourteenth Amendment, provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" McKune v. Lile, 536 U.S. 24, 35,

7

122 S. Ct. 2017, 2026, 153 L. Ed. 2d 47 (2002) (citing Malloy v. Hogan, 378 U.S. 1, 7, 84 S. Ct. 1489, 1493, 12 L. Ed. 2d 653 (1964)). Likewise, Article 1, Section 9 of the Constitution of the State of Florida provides: "No person shall . . . be compelled in any criminal matter to be a witness against oneself."

Critically, "[t]he 'Amendment speaks of compulsion,' and the [United States Supreme] Court has insisted that the 'constitutional guarantee is only that the witness not be *compelled* to give self-incriminating testimony.'" McKune, 536 U.S. at 35-36, 122 S. Ct. at 2026 (internal citations omitted); see also Hoffa v. United States, 385 U.S. 293, 303-04, 87 S. Ct. 408, 414, 17 L. Ed. 2d 374 (1966) ("[S]ince at least as long ago as 1807, when Chief Justice Marshall first gave attention to the matter in the trial of Aaron Burr, all have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion."). Thus, "[t]he Self-Incrimination Clause reflects 'a judgment . . . that the prosecution should [not] be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused.'" Doe v. United States, 487 U.S. 201, 212, 108 S. Ct. 2341, 2348, 101 L. Ed. 2d 184 (1988) (alterations in original) (citations omitted).

"In the Fifth Amendment context, [the United States Supreme Court has] created [certain] prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause." Chavez v. Martinez, 538 U.S. 760, 770, 123 S. Ct. 1994, 2003, 155 L. Ed. 2d 984 (2003). The most well-known

8

prophylactic rule was articulated by the Supreme Court in <u>Miranda v. Arizona</u>. 384 U.S. 436, 86 S. Ct. 1602. In <u>Miranda</u>, the Court held "the police [are required to] inform a criminal suspect that he has the right to remain silent and that anything he says may be used against him." <u>Colorado v. Spring</u>, 479 U.S. 564, 577, 107 S. Ct. 851, 859, 93 L. Ed. 2d 954 (1987). Despite the holding in <u>Miranda</u>, as more fully discussed by Justice Antonin Scalia in his dissent in <u>Dickerson v. United States</u>, 530 U.S. 428, 444, 120 S. Ct. 2326, 2337, 147 L. Ed. 2d 405 (2000) (Scalia, J., dissenting), the Supreme Court has continued to distinguish between the right against compulsory self-incrimination as textually embodied in the Constitution and the judicially-created prophylactic rules designed to protect that right. For example, in <u>Michigan v. Tucker</u>, 417 U.S. 433, 444, 94 S. Ct. 2357, 2364, 41 L. Ed. 2d 182 (1974), the Court further reaffirmed that <u>Miranda</u> warnings "were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected," and to "provide practical reinforcement for the right." Thus, the Court concluded that "police conduct at issue [in that case] did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by [the] Court in <u>Miranda</u> to safeguard that privilege." <u>Id.</u> at 446, 94 S. Ct. at 2364-65.

9

Generally, the privilege against self-incrimination is not self-executing.[4] See Minnesota v. Murphy, 465 U.S. 420, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984). However, as discussed in Miranda, "a suspect who is subjected to the 'inherently compelling pressures' of an unwarned custodial interrogation need not invoke the privilege" against self-incrimination until after "being suitably warned." Salinas v. Texas, 570 U.S. 178, 184-85, 133 S. Ct. 2174, 2180, 186 L. Ed. 2d 376 (2013) (plurality opinion) (quoting Miranda, 384 U.S. at 467-68, 86 S. Ct. at 1624 & n.37; Murphy, 465 U.S. at 429-30, 104 S. Ct. at 1136). "Although Miranda's requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." Roberts v. United States, 445 U.S. 552, 560, 100 S. Ct. 1358, 1364, 63 L. Ed. 2d 622 (1980). Since Miranda was decided, the Supreme Court has confronted the issue of whether an assertion of the privilege is required in cases in which the state compels a person to forego the "privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'" Murphy, 465 U.S. at 434, 104 S. Ct. at 1146 (quoting Lefkowitz v. Cunningham, 431 U.S. 801, 806, 97 S. Ct. 2132, 2136, 53 L. Ed. 2d 1 (1977)).

---

[4] In this context, "not self-executing" means the privilege may not be relied upon to suppress self-incriminatory testimony, "unless it is invoked." Roberts, 445 U.S. at 559, 100 S. Ct. at 1364.

In Garrity v. New Jersey, the Court discussed one such exception to the general rule that the privilege against self-incrimination is not self-executing, namely where statements are the product of an impermissible condition imposed on the privilege. 385 U.S. 493, 87 S. Ct. 616. The Court addressed whether the state could use the threat of discharge to secure self-incriminatory testimony from an employee. Id. Under the facts therein, several police officers were questioned during an investigation into police corruption involving the manipulation of traffic tickets. Before being questioned, each officer was warned that anything he said might be used against him in a state court criminal proceeding, and that he had the right to refuse to answer if the disclosure would be incriminating, but if he refused to answer he would be subject to termination. Given the choice "either to forfeit their jobs or incriminate themselves," the officers confessed. Id. at 497, 87 S. Ct. at 618. The statements were later used in prosecutions for conspiracy to obstruct the administration of traffic laws and the officers were convicted. The Supreme Court found:

> The choice imposed on [the officers] was one between self-incrimination or job forfeiture. Coercion that vitiates a confession under Chambers v. Florida, 309 U.S. 227, 60 S. Ct. 472, 84 L. Ed. 716 (1940), and related cases can be "mental, as well as physical"; "the blood of the accused is not the only hallmark of an unconstitutional inquisition." Blackburn v. Alabama, 361 U.S. 199, 206, 80 S. Ct. 274, 279, 4 L. Ed. 2d 242 (1960). Subtle pressures (Leyra v. Denno, 347 U. S. 556, 74 S. Ct. 716, 98 L. Ed. 948 (1954); Haynes v. Washington, 373 U.S. 503, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963)) may be as telling as coarse and vulgar ones. The question is whether the accused was

11

> deprived of his "free choice to admit, to deny, or to refuse to answer." Lisenba v. California, 314 U.S. 219, 241, 62 S. Ct. 280, 292, 86 L. Ed. 166 (1941).

Id. at 496, 87 S. Ct. at 618. The Court concluded that "[w]here the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive'" one's constitutional rights or to lose one's job. Id. at 498, 87 S. Ct. at 619. Thus, the free will of the officers to assert their Fifth Amendment privilege, as applied through the Fourteenth Amendment, was overborne; the statements were coerced and inadmissible. Id. The Court found the privilege against self-incrimination to be self-executing where "an individual threatened with discharge from employment for exercising the privilege had not waived it by responding to questions rather than standing on his right to remain silent." Murphy, 465 U.S. at 435, 104 S. Ct. at 1146 (citation omitted).

The Supreme Court expanded upon this analysis in Murphy, by considering whether certain probation conditions rendered the privilege against self-incrimination "self-executing." 465 U.S. 420, 104 S. Ct. 1136. There, Marshall Murphy, a probationer, met with his probation officer and was questioned regarding a crime distinct from the one for which he was on probation. Under the terms of his probation, Murphy was required to appear when summoned and to be truthful with his probation officer in all matters. Failure to comply with these obligations could give rise to a revocation of his probation. Murphy confessed to his probation officer

12

to committing the crime, and was later prosecuted. He challenged the admissibility of his incriminating statements, contending they were coerced under threat of revocation of probation, in violation of the impermissible penalty principle as outlined in Garrity.

In determining whether "there [was a] reasonable basis for concluding that Minnesota attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination," the Court considered both Murphy's subjective state of mind, and the objective reasonableness of his belief. Id. at 437, 104 S. Ct. at 1148. In doing so, the Court looked to three factors. First, the Court highlighted the lack of "direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." Id. Second, the Court observed that Murphy had not been expressly informed in person that he would be so penalized. Id. at 438, 104 S. Ct. at 1148. Third, the Court noted that during the meeting, Murphy "apparently felt no compunction about adamantly denying" some of the charges, strongly suggesting "the 'threat' of revocation did not overwhelm his resistance." Id. The Court reasoned "[w]hether we employ a subjective or an objective test . . . [the Court] cannot conclude that Murphy was deterred from claiming the privilege by a reasonably perceived threat of revocation." Id. at 438-39, 104 S. Ct. at 1148. Moreover, "it [was] clear that Murphy was not 'in custody' for purposes of receiving Miranda protection." Id. at 430, 104 S. Ct. at 1144. Thus,

absent an impermissible penalty or unwarned custodial interrogation, the situation therein "[did] not give rise to a self-executing privilege" that would require the suppression of self-incriminatory testimony.  Id. at 435, 104 S. Ct. at 1146.

Here, the trial court found that between the second and third statements, interrogating officers informed Socarras, "we have to make this look like an isolated incident if you want to try to maintain your position in narcotics."[5]  As such, the statement was "obtained under threat of removal from office," violating Socarras's "Fourteenth Amendment [protection] against coerced statements," and the trial court properly found the third statement could not be "use[d] in subsequent criminal proceedings."  Garrity, 385 U.S. at 500, 87 S. Ct. at 620.  Therefore, we affirm the suppression of the third statement, without further elaboration, and focus our analysis on the propriety of the suppression of Socarras's two initial statements.

Given that the sole concern of the Fifth Amendment's Self-Incrimination Clause is governmental coercion, "[a] subjective belief that Garrity applies will not be considered objectively reasonable if the state has played no role in creating the impression that the refusal to give a statement will be met with termination of employment." United States v. Camacho, 739 F. Supp. 1504, 1515 (S.D. Fla. 1990) (citing United States v. Solomon, 509 F.2d 863, 871–72 (2nd Cir. 1975) (Friendly,

---

[5] As in Garrity, Socarras's privilege against self-incrimination was self-executing. Socarras did not need to invoke the privilege when faced with an impermissible penalty attached to its exercise.  Murphy, 465 U.S. at 434-35, 104 S. Ct. at 1146.

J.) (drawing distinction between Garrity and case where threat was made by a non-state actor and finding that "[i]t is settled law that the common law rule excluding confessions induced by a threat is limited to inducement by 'a person in authority[;]' what is generally required is a 'legal interest in the prosecution' and 'not the mere existence of actual control or influence growing out of the social or commercial relations of the persons.'") (citation omitted); United States ex rel. Sanney v. Montanye, 500 F.2d 411, 415 (2nd Cir. 1974) ("The controlling factor is . . . the fact that the state had involved itself in the use of substantial economic threat to coerce a person into furnishing an incriminating statement.")); see also Colorado v. Connelly, 479 U.S. 157, 170, 107 S. Ct. 515, 523, 93 L. Ed. 2d 473 (1986) ("The sole concern of the Fifth Amendment . . . is government coercion.") (citations omitted). Moreover, "the mere fact that an employee may have felt compelled to make a statement to his colleagues and superiors as a normal part of his duties is not sufficient to implicate Garrity." People v. Koverman, 38 P.3d 85, 89 (Colo. 2002).

Several well-reasoned cases have reiterated the principle that a mere subjective belief, in the absence of state action, is insufficient to implicate Garrity. In People v. Sapp, 934 P.2d 1367 (Colo. 1997), the Colorado Supreme Court considered whether testimony from two officers, who believed the failure to cooperate in an internal investigation would result in discharge, was sufficient to invoke Garrity immunity. The court stated: "[C]ourts applying Garrity in non-

15

automatic penalty situations have emphasized that ordinary job pressures, such as the possibility of discipline or discharge for insubordination, are not sufficient to support an objectively reasonable expectation of discharge." Id. at 1372. After examining the facts, the court concluded:

> A mere subjective belief that termination will result is not objectively reasonable, as a matter of law, even if it is shared by others. The state must have played a significant role in creating the impression that [the officers] might be discharged for asserting the privilege for their beliefs to be considered objectively reasonable. To be significant, the state's role in creating such beliefs must have been more coercive than the requirement that a witness testify truthfully.

Id. at 1374.

Similarly, in State v. Connor, 861 P.2d 1212 (Idaho 1993), a police officer sought suppression of statements made during an internal investigation of misconduct, for which he was ultimately prosecuted. The officer testified he feared he would be fired if he refused to relinquish his right against self-incrimination. He further indicated he was ordered to make the statements by his superior officers. The Idaho Supreme Court determined the officer's subjective belief was objectively unreasonable, as there was no evidence other than the officer's own testimony that potential job loss was a threatened penalty.

The Eleventh Circuit Court of Appeals adopted a similar analysis in United States v. Vangates, 287 F.3d 1315 (11th Cir. 2002). There, a correctional officer was extended Garrity immunity in conjunction with an internal affairs investigation

16

into inmate abuse. After the investigation concluded, the officer was subpoenaed to appear in a civil trial. She provided testimony at the trial, essentially corroborating the contents of her statements made during the internal affairs investigation. She was subsequently indicted for crimes relating to the abuse investigation, and sought the suppression of her civil testimony under Garrity. The officer testified she subjectively believed she would have been subject to discipline if she refused to provide statements in the civil case. The court reiterated the adage that a subjective belief of compulsion, under penalty of termination, must be supported by surrounding objective circumstances, and explicitly rejected the proposition that the requirement to appear, alone, is sufficient to support a finding of compulsion. The court stated:

> Significantly, [the officer] was not told that she would be sanctioned if she failed to testify, and certainly she was not required to waive her Fifth Amendment rights. The general directive to cooperate was not sufficiently coercive to create an objectively reasonable belief that [the officer] would be sanctioned if she invoked her Fifth Amendment rights.

Id. at 1324.

In consideration of Garrity and its progeny, we examine the totality of the circumstances in determining the voluntariness of a confession. Blackburn, 361 U.S. at 206, 80 S. Ct. at 280; see also Braddy v. State, 111 So. 3d 810, 832 (Fla. 2012) ("We have previously stated that '[w]here a defendant alleges that his statement was the product of coercion, the voluntariness of the confession must be determined by

17

an examination of the totality of the circumstances.'") (citation omitted). Thus, in order for the impermissible penalty principle of <u>Garrity</u> to apply, Socarras "must have in fact believed [the] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." <u>United States v. Friedrick</u>, 842 F.2d 382, 395 (D.C. Cir. 1988).

Here, it is undisputed that prior to Socarras's first and second statements, the State did not threaten Socarras with adverse employment consequences or any other impermissible penalty. Similar to the officers in <u>Sapp</u>, <u>Connor</u>, and <u>Vangates</u>, Socarras testified to a subjective belief that an invocation of his right against self-incrimination would result in termination. However, unlike the officers in the analogous authorities, Socarras was administered <u>Miranda</u> warnings and explicitly waived his rights.[6] Furthermore, the dissimilarity between Socarras's prior internal

---

[6] The fact that Socarras was administered his <u>Miranda</u> warnings is but one consideration in determining the objective reasonableness of his purported belief he was coerced to testify. <u>See</u> <u>Beckwith v. United States</u>, 425 U.S. 341, 348, 96 S. Ct. 1612, 1617, 48 L. Ed. 2d 1 (1976) ("Proof that some kind of warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive.") (citations omitted). The sole ground asserted below in support of suppression was the impermissible penalty analysis advanced in <u>Garrity</u>. On appeal, however, relying upon identical facts, Socarras contends his waiver of <u>Miranda</u> rights was involuntary. As the record fails to demonstrate coercion, an analysis of voluntariness under either <u>Garrity</u> or <u>Miranda</u> necessitates the same result–the statements, rendered post-<u>Miranda</u>, were not compelled. <u>See</u> <u>Schoenwetter v. State</u>, 931 So. 2d 857, 867 (Fla. 2006) ("We have said that to establish that a statement is involuntary, there must be a finding of coercive police conduct.") (citing <u>Chavez v. State</u>, 832 So. 2d 730, 749 (Fla. 2002)).

18

affairs investigations and the detention on the evening of the theft quells the reasonableness of any subjective or objective finding that Socarras was immersed in a mere administrative proceeding, thus compelled to confess under a postulated penalty of termination. Socarras conceded that, as a ten-year police veteran, he had performed legions of arrests and administered Miranda warnings on approximately fifty occasions. Moreover, as the subject of four prior internal affairs investigations, he was well-versed in the administrative process. In each of the prior administrative investigations, Socarras was provided with advance notice of the interview and signed a Garrity immunity form. He appeared on his own volition at a familiar precinct, and was allowed uninhibited interaction with a police union representative. He was not restrained in any way or relieved of his service weapon, and he was given unfettered access to the case file. Finally, his body was not scanned or frisked for evidence.

In stark contrast, when detained in the instant case, Socarras was stopped by an officer in the middle of the night, held at gunpoint, handcuffed, frisked, and transported in the back of a police cruiser to an unknown precinct. He was subjected to ultraviolet scan, relieved of his service weapon, read Miranda warnings, and divested of his police vehicle, which was treated as evidence. These circumstances constituted a de facto arrest, and they mirrored those preceding the arrest of the undercover officer effected by Socarras earlier in the evening. See Cocke v. State,

19

889 So. 2d 132, 135 (Fla. 4th DCA 2004) (use of handcuffs and detention in patrol car for 25 minutes constitutes a de facto arrest); Poey v. State, 562 So. 2d 449, 450 (Fla. 3d DCA 1990) ("When defendant was informed of his Miranda rights, handcuffed, and placed inside the patrol car, he was arrested."). Under these circumstances, it is unfathomable that a reasonable person, particularly an experienced law enforcement officer, would not be aware that a criminal investigation had commenced.

Finally, Socarras did not reference the missing currency in his initial statement, and, unprompted, volunteered an exculpatory explanation in his second statement. As in Murphy, Socarras "apparently felt no compunction about adamantly denying" he engaged in criminal activity, strongly suggesting any subjective belief of employment sanctions "did not overwhelm his resistance." 465 U.S. at 438, 104 S. Ct. at 1148.

Under these circumstances, Socarras "was not put between the rock and the whirlpool," but rather, after Miranda was administered and before any impermissible penalty was threatened, he "was standing safely on the bank of the stream." Singer v. Maine, 49 F.3d 837, 847 (1st Cir. 1995) (citing United States v. Indorato, 628 F.2d 711, 717 (1st Cir. 1980)). The warnings sufficiently dispelled "whatever coercion [was] inherent in the interrogation process." Moran v. Burbine, 475 U.S. 412, 427, 106 S. Ct. 1135, 1144, 89 L. Ed. 2d 410 (1986). Thus, "[i]f any other citizen had

20

made the statement[s] [Socarras] did in a similar . . . criminal investigation, a court would have no difficulty in concluding such statement[s] [were] voluntary as a matter of law." State v. Brockdorf, 717 N.W.2d 657, 670 (Wis. 2006). As such, "[e]ssentially, [Socarras] is looking for greater constitutional protection than the average citizen because [he] is a police officer; we do not interpret the Fifth Amendment or Garrity as providing the expansive protection [Socarras] asks for." Id.

With regard to the two initial statements, we cannot conclude there is a reasonable basis to find the State attempted to attach an impermissible penalty to the exercise of Socarras's privilege against self-incrimination. Thus, the prophylactic rule established in Garrity is inapplicable, as Socarras's Fifth Amendment privilege, as applied through the Fourteenth Amendment, was not self-executing. Accordingly, the trial court erred in suppressing the initial two statements and we reverse the suppression of the two initial statements.

Reversed in part, affirmed in part.