FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

No. 1D2022-3114

_____

LAURA R. CARROLL,

　　Appellant,

　　v.

STATE OF FLORIDA,

　　Appellee.

_____

On appeal from the Circuit Court for Escambia County.
Coleman L. Robinson, Judge.

April 10, 2024

ROWE, J.

When the results of Tate High School's 2020 homecoming queen election came in, Laura Carroll's daughter appeared to have won convincingly. But not everyone was convinced. The teacher responsible for administering the election reported to school officials that many votes in the election had been flagged by the election application software—and that every flagged vote had been cast for Carroll's daughter. At the time, Carroll was an assistant principal at Bellview Elementary School, with district-wide access to all student accounts in the school district's FOCUS portal. It was suspected by some that Carroll's daughter had access to her mother's credentials to the FOCUS portal and had used that access to acquire confidential student information. Information that she then used to cast votes for herself in the homecoming

queen election. The school district appointed Gary Marsh to investigate the report. Marsh concluded that the suspicions linking Carroll to the improperly cast votes were well-founded.

Tate High School allowed students to vote for homecoming queen through an application called Election Runner. On election day, Election Runner administrators reported to the school district that one hundred seventeen votes had been flagged as "false." To cast votes in the election, students had to verify their identity using their student identification number and their date of birth. This information was available in FOCUS. All the votes flagged by Election Runner were from students whose records had been accessed from Carroll's FOCUS account in the thirty days before the election. And every flagged vote was cast for Carroll's daughter.

As an assistant principal at Belleview with administrator access, Carroll could use FOCUS to review confidential information for any student in the school district, including grades, attendance, and mental health records. Marsh reviewed a report from the school's information management system and confirmed that Carroll's FOCUS credentials were used to view confidential information of two hundred twelve Tate High School students in the thirty days before the homecoming queen election. And in the year before the election, confidential records of three hundred thirty-nine students at Tate were accessed with Carroll's credentials. As Carroll worked at the elementary school, it was unclear why she would have needed to access records of students at Tate.

District officials decided to question Carroll to see if she had an explanation for accessing so many high school student records. Marsh went to Belleview to speak with Carroll, but she refused to talk to him. Marsh then asked Carroll to come to the school district's office for a formal interview.

When Carroll arrived, she was questioned for an hour by Marsh, with another school district official present—the information technology security manager. Carroll sat close to the door in the conference room where she was questioned. Marsh confirmed to Carroll that she was free to leave at any time. Carroll

2

answered some questions but she refused to answer others. At times, she stated: "Well, I'm not going to tell you that," and "I'm not going to tell you." She did admit that she had provided her daughter with access to her FOCUS credentials in the past.

When the school district's investigation concluded, Marsh reported the data breach to the Florida Department of Law Enforcement. FDLE investigated and verified that someone using Carroll's credentials illegally accessed confidential records of Tate High School students in FOCUS. FDLE confirmed that one hundred seventeen votes in the homecoming queen election originated from a single Internet Protocol (IP) address. FDLE traced the IP address to Verizon and back to Carroll's cell phone number.

FDLE also obtained nine written statements from Tate High School students and one teacher who attested that they had witnessed Carroll's daughter using her mother's FOCUS credentials or that the daughter had spoken with them about such use. One student reported that Carroll's daughter had bragged about using her mother's FOCUS credentials for the past four years, from the time she was a freshman at Tate. FDLE learned that FOCUS users had to change their passwords every forty-five days—meaning that Carroll's daughter would have needed to regularly obtain or discover Carroll's new passwords. FDLE also reviewed a written statement provided by Carroll's daughter, admitting that she had access to Carroll's FOCUS account.

FDLE also obtained records of the administrative hearing on the expulsion of Carroll's daughter from school. During the hearing, Carroll submitted a letter to the hearing officer, stating that her daughter was guilty of accessing information from Carroll's FOCUS account. Carroll admitted that she herself had viewed the records of hundreds of students at Tate by using her district administrator access.

FDLE applied for a warrant for Carroll's arrest. Carroll[*] was arrested and charged with (1) accessing a computer system without authorization, (2) illegal use of personal identification information, (3) unlawful use of a two-way communications device to facilitate the commission of a felony, and (4) conspiracy to commit a felony.

Carroll moved to suppress the statements she made during the meeting with Marsh. She argued that her statements were coerced in violation of her right against self-incrimination because she feared adverse employment consequences if she did not cooperate with Marsh. The trial court denied the motion.

Carroll then pleaded no contest to the use of a two-way communications device to facilitate a felony in exchange for the State dropping the other three charges. She reserved the right to appeal the trial court's denial of her motion to suppress. The trial court withheld adjudication and sentenced her to eighteen months of probation. This timely appeal follows.

A defendant may seek an appeal after entering a guilty or no contest plea if the issue is expressly reserved and dispositive. *Massey v. State*, 324 So. 3d 40, 40 (Fla. 1st DCA 2021). An issue is dispositive if the State stipulates to dispositiveness or "if the evidence that is the subject of the motion is necessary to obtain a conviction." *Le Boss v. State*, 359 So. 3d 436, 440–41 (Fla. 1st DCA 2023). The admission of Carroll's statements to Marsh would have been dispositive.

This court reviews a trial court's ruling on a motion to suppress under a mixed standard. *Tyson v. State*, 351 So. 3d 1184, 1186 (Fla. 1st DCA 2022). The court's factual findings must be supported by competent, substantial evidence, and the court's legal conclusions are reviewed de novo. *Id.*

---

[*] The State charged Carroll's daughter with the same offenses. After her successful completion of a pretrial intervention program, the State dismissed the charges against the daughter.

Carroll argues that the trial court should have suppressed her statements to Marsh because she was coerced into answering his questions in violation of her privilege against self-incrimination. She claims that she believed her job would be adversely affected if she did not answer Marsh's questions. Citing *Garrity v. New Jersey*, 385 U.S. 493 (1967), Carroll argues that her coerced incriminatory statements may not be used in a criminal proceeding against her. As we will explain, the trial court correctly determined that *Garrity* did not require suppression of Carroll's statements.

The Fifth Amendment of the United States Constitution and article I, section 9 of the Florida Constitution provide that no person will be compelled in any criminal case to be a witness against himself. This prohibition not only allows a person to refuse to testify against himself at a criminal trial when he is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).

In the context of government employment, if a government employer coerces an employee to surrender her privilege against self-incrimination by threatening the employee with an adverse employment action for refusing to answer questions from the employer, any incriminating statements may not be used in a future criminal proceeding. *Id.* at 78–79. In *Garrity*, police officers were questioned during an internal investigation about the alleged fixing of traffic tickets. *Garrity*, 385 U.S. at 494. Before questioning, each officer was warned "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office." *Id.* Given the choice "to forfeit their jobs or incriminate themselves," the officers confessed, and their statements were later used in a criminal prosecution. *Id.* at 497.

The Supreme Court held that the option of losing their jobs or giving self-incriminating testimony was "the antithesis of free choice to speak out or to remain silent." *Id.* "Where the choice is between the rock and the whirlpool, duress is inherent in deciding

5

to waive one or the other." *Id.* at 498 (quotations omitted). For this reason, the Supreme Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id.* at 500.

The immunity recognized in *Garrity* extends not only to a government employee's incriminatory statements obtained during questioning when the employer is a law enforcement agency but also when other government employers question employees with a threat of adverse employment action if they refuse to answer questions. *See Cropsey v. Sch. Bd. of Manatee Cnty.*, 19 So. 3d 351, 355 (Fla. 2d DCA 2009) (considering *Garrity* immunity in the context of statements made by a public school teacher to her school board employer). This is because the privilege against self-incrimination applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it.*" McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924).

But before a government employee is entitled to *Garrity* immunity for incriminatory statements provided to her employer, she must show she was threatened with an adverse employment action if she failed to answer her employer's questions. *See Cropsey*, 19 So. 3d at 355. The threat of an adverse employment action may be direct or implied. *See United States v. Vangates*, 287 F.3d 1315, 1321–22 (11th Cir. 2002).

At issue here is whether there was an implied threat by the school district. Carroll does not contend that Marsh directly threatened to fire her or take any other adverse employment action if she refused to answer his questions. Instead, she argues that she believed that she would be terminated if she refused. But to be entitled to suppression of her statements to Marsh, it was not enough that Carroll subjectively believed that she would suffer an adverse employment action if she refused to answer Marsh's questions. Rather, her belief had to be objectively reasonable. *State v. Socarras*, 272 So. 3d 488, 495 (Fla. 3d DCA 2019). An employee's subjective belief "will not be considered objectively reasonable if

6

the state has played no role in creating the impression that the refusal to give a statement will be met with termination of employment." *Id.* (quoting *United States v. Camacho*, 739 F. Supp. 1504, 1515 (S.D. Fla. 1990)). A trial court must consider the totality of the circumstances when determining whether an employee's belief is objectively reasonable. *Vangates*, 287 F.3d at 1322.

Carroll argued that her belief that she would suffer adverse consequences was objectively reasonable because (1) the school district's letter compelling her to appear for questioning was the functional equivalent of a subpoena; (2) Marsh did not advise her that she was not required to answer his questions; and (3) there was an expectation that administrators would cooperate with school district investigations. We disagree. Under the circumstances of this case, Carroll's subjective belief that she would suffer an adverse employment action if she did not answer Marsh's questions was not objectively reasonable.

First, the letter directing Carroll to appear for an interview at the school district office provides, "You are to appear." The letter did not state that Carroll would be sanctioned for failing to appear and did not tell her that she had to waive her Fifth Amendment rights. Rather, the letter was more of a general directive to cooperate. *See Socarras*, 272 So. 3d at 496–97 (explaining that a directive to cooperate is not so coercive to create a reasonably objective belief under *Garrity*).

Second, Marsh may not have advised Carroll that she did not have to speak with him, but Carroll's interactions with Marsh show that she did not feel compelled to answer his questions. When Marsh approached her at Belleview, she refused to answer any of his questions. And during the more formal interview at the school district office, Carroll confirmed with Marsh that she was free to leave the interview at any time. She was seated closest to the door of the conference room. And there was nothing about the questioning that signified that Carroll could not leave. Carroll also refused to answer some of Marsh's questions. Those refusals contradict her claim that she felt compelled to answer Marsh and that she believed her refusal to do so would subject her to adverse employment actions. *See Socarras*, 272 So. 3d at 498 ("As in

7

*Murphy*, Socarras 'apparently felt no compunction about adamantly denying' he engaged in criminal activity, strongly suggesting any subjective belief of employment sanctions 'did not overwhelm his resistance.'" (quoting *Minnesota v. Murphy*, 465 U.S. 420, 438 (1984))).

Finally, Carroll argues that there was an expectation that administrators would cooperate with school district investigations. But "the mere fact that an employee may have felt compelled to make a statement to his colleagues and superiors as a normal part of his duties is not sufficient to implicate *Garrity*." *Id.* at 496 (quoting *People v. Koverman*, 38 P.3d 85, 89 (Colo. 2002)). Carroll has identified no school district rule or policy that required her to answer Marsh's questions or face termination. Marsh told Carroll that the school district expected administrators to cooperate with investigations, but he never told her that she had to answer his questions or that she would be subject to a sanction for failing to do so. And even when faced with this information, Carroll still refused to answer some of Marsh's questions.

On these facts, Carroll did not have an objectively reasonable belief that she would be subject to adverse employment consequences if she did not answer questions from her employer. For this reason, the trial court did not err when it concluded that Carroll's incriminatory statements to Marsh should not be suppressed on grounds of *Garrity* immunity.

AFFIRMED.

B.L. THOMAS and ROBERTS, JJ., concur.

---

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

---

Luke Newman of Luke Newman, P.A., Tallahassee, for Appellant.

8

Ashley Moody, Attorney General, and Daren L. Shippy, Assistant Attorney General, Tallahassee, for Appellee.